142 So.2d 228

**ALABAMA POWER COMPANY**
**v.**
**Carrie S. SMITH et al.**

**C. Pierson COSBY**
**v.**
**Carrie S. SMITH et al.**

**John J. SMEDLEY**
**v.**
**Carrie S. SMITH et al.**

**2 Div. 401–403.**

Supreme Court of Alabama.

March 22, 1962.

Rehearing Denied June 21, 1962.

Bonner & Bonner, Camden, and Martin, Vogtle, Balch & Bingham, Alvin W. Vogtle, Jr., and Carey J. Chitwood, Birmingham, for appellant Alabama Power Co.

Harry W. Gamble and McLean Pitts, Selma, for appellant Cosby.

Pitts & Pitts and Cecil C. Jackson, Jr., Selma, for appellant Smedley.

Roy Kimbrough, Thomasville, and Godbold, Hobbs & Copeland, Montgomery, for appellees.

COLEMAN, Justice.

This is an appeal by defendants from a judgment for plaintiffs, rendered on a jury verdict, in an action for wrongful death.

Mitchell & Nall, Inc., hereinafter sometimes referred to as the contractor, was engaged in constructing an additional wing to a school building in Dallas County. The deceased, for whose death the action is brought, was Earl Smith. He was an employee of the contractor. The widow and minor children of Smith are the plaintiffs in the case. The contractor is not a party to this action.

The three defendants are the Alabama Power Company, a corporation, sometimes herein referred to as the Power Company or the company; C. Pierson Cosby; and John J. Smedley. The Power Company maintained high tension wires carrying a potential of 4160 to 2400 volts to provide electrical service to the school. The new wing of the school building lay under the wires. The wires were approximately fifteen feet above the roof of the new wing. The wires were not insulated. The wing was one-story high, about 13½ feet above the ground.

The roof of the new wing was to be made of steel reinforced concrete. In order to lift fresh concrete from the ground to the roof, the contractor procured a crane which was used to lift a bucket of concrete from the ground and swing the bucket over the roof where the bucket was emptied and the concrete spread so as to form the roof.

The crane used for this purpose was the property of the defendant, Cosby. The crane operator was the defendant, Smedley. The contractor arranged with Cosby to use the crane and the operator. The operator, Smedley, was employed by Cosby. Whether Smedley continued to be the servant of Cosby so as to make Cosby liable for injury proximately resulting from Smedley's negligence is one of the questions in the case.

The deceased, Earl Smith, was an electric welder. He had been assigned the duty of giving signals to the crane operator and of helping to dump the concrete on the roof. Two other employees of the contractor were under Smith's supervision to assist him in dumping the concrete.

When first brought to the job, the crane was equipped with a 35-foot boom which was not long enough, so a 15-foot extension was added. The bucket, when loaded with concrete, weighed 2700 to 2900 pounds.

On the morning of the day in question, concrete was lifted to the roof and poured in one position. The crane was then moved to another position. At some time during the moving of the crane, the cable from which the bucket was suspended touched the high tension wire and made "sparks fly." The crane was moved a "little bit further away" from the wires.

Shortly after lunch, the pouring of concrete in the new position was resumed. Smith and his two helpers were unloading a bucket of concrete on the roof. Smedley testified as to Smith's actions at the time he was fatally injured as follows:

"A He give me a signal to move over a little closer.

"Q What did you do then?

"A I moved over. He taken one step back.

"Q Just tell us what took place after that?

"A He taken one step back, and looked up at the wires, and looked back down at his two men, and said something—I never did know—and he pulled the bucket and they pushed it, and it hit the wire, and, well, fire flew from the boom; and when it flew from the boom, I just reversed it right back from the wire, and hollered at the others there was three men down up there."

The case was tried on a single count charging that the negligence of Cosby and Smedley in operating or maintaining the crane and the negligence of the Power Company in allowing or causing its electric wires to become or remain in an unsafe condition united or concurred in proximately causing the death of Smith. Each defendant pleaded the general issue and contributory negligence on the part of Smith, in short by consent. The defendants have severally assigned errors and have filed separate briefs.

*Pleas in Abatement.*

Defendants, Cosby and Smedley, each filed a separate plea in abatement which asserts that the venue was improperly laid in Wilcox County. The pleas allege that none of the defendants had a permanent residence in Wilcox County and that each of the defendants, respectively, was a permanent resident of another county. The complaint alleges that the act or omission which caused the death of Smith occurred in Dallas County.

The court sustained plaintiffs' demurrers to the pleas in abatement and those rulings of the court are assigned as error.

Cosby and Smedley argue that because none of the defendants had a permanent residence in Wilcox County and all the defendants had a permanent residence in a different county, the action could not be brought properly in Wilcox County under § 54, Title 7, which provides in pertinent part that: "* * * all other personal actions, if the defendant or one of the defendants has within the state a permanent residence, may be brought in the county of such residence, or in the county in which the act or omission complained of may have been done or may have occurred. * * *" These defendants concede, however, that under § 60, Title 7, a corporation may be sued in any county in which it does business by agent, and that, if the Alabama Power Company were the only defendant, then the action would have been properly brought

in Wilcox County. In support of this argument, the defendants rely on Eagle Iron Co. v. Baugh, 147 Ala. 613, 41 So. 663, where it was said concerning § 4207, Code 1896, the progenitor of § 60, Title 7:

> "* * * Section 4207 applies to suits against corporations when they are sole defendants, and does not conflict with sections 4205 and 3271 in reference to suits against two or more defendants." (147 Ala. at page 617, 41 So. at page 664)

The defendants further recognize that their contention is contrary to the holding in Louisville & Nashville R. Co. v. Strickland, 219 Ala. 581, 122 So. 693, but insist that the holding in the Strickland case is erroneous.

In the Strickland case, this court said that § 9418, Code 1923 (§ 185, Title 7, Code 1940), provides that any joint or joint and several action may be brought in a county having jurisdiction of any one of the defendants, and be executed in any county in the state. The court held that the pleas in abatement in that case were subject to the ground of demurrer which pointed out that the pleas did not allege that one of the corporate defendants was not doing business in the county where the action was brought, which, by coincidence, was also Wilcox County, when that action was commenced.

In the instant case, the pleas do not allege that the defendant, Alabama Power Company, a corporation, was not doing business in Wilcox County when this action was commenced. The demurrers pointed out this defect in the pleas. The rulings sustaining the demurrers are supported by the decisions of this court and are not in error. National Surety Company v. First National Bank of Opelika, 225 Ala. 108, 142 So. 414; Ex parte Kemp, 232 Ala. 434, 168 So. 147; Leath v. Smith, 240 Ala. 639, 200 So. 623; Ex parte Southern Bell Tel. & Tel. Company, 267 Ala. 139, 99 So.2d 118.

*Demurrer to Complaint.*

The Power Company has assigned as error the action of the court in overruling its demurrer to the complaint. As last amended the complaint contained a single count, E(1), which recites as follows:

> "The plaintiff, Carrie S. Smith, who is the widow of Earl Smith, deceased, and William Earl Smith, Bobbie Jean Smith and Alice Sylvia Smith, minor children of the said Earl Smith, acting by their mother and next friend, Carrie S. Smith, sue as the dependents of Earl Smith, deceased, and claim $100,000.00 as damages of the defendants for that heretofore on to-wit, the 29th. day of October, 1956, the said Earl Smith, now deceased, was employed by Mitchell & Nall, Inc., a building contractor, on a construction job at R. B. Hudson High School located on, to-wit, First Avenue and Lapsley Street in the City of Selma, County of Dallas, Alabama.
>
> "The plaintiffs further aver that on, to-wit, said date and day and at said time and place the defendants, C. Pierson Cosby and John J. Smedley, were engaged in the business of maintaining and operating a crane in delivering concrete to the roof of the wing of said school building which wing was under construction.
>
> "The plaintiffs further aver that on, to-wit, said day and date and at said time and place the defendant Alabama Power Company was engaged in the business of distributing electric current and in connection with said business, maintained uninsulated wires or an uninsulated electric line or lines suspended in the air, charged with currents of electricity dangerous or deadly to the life or limb of human beings coming into contact or close proximity therewith, a short distance above and in close proximity to the place where the said Earl Smith, now deceased, was

then working. The plaintiffs further aver that the said defendant Alabama Power Company then had knowledge or notice that said construction was being done in close proximity to its said electric power line or lines and that workmen employed in the construction of said building were working in close proximity to said electric power line or lines. The plaintiffs further aver that the defendants, C. Pierson Cosby and John J. Smedley, then had knowledge or notice that the said Earl Smith, now deceased, and other workmen employed in the construction of said building were on the roof of the wing of said school building and were a short distance below and in close proximity to said electric power line or lines and were receiving and assisting in the pouring of the concrete being delivered by said crane.

"The plaintiffs further aver that then and there the said Earl Smith, now deceased, was on the roof of the wing of said school building where his duties under his said employment required him to be, and where he had a right to be for the purpose of receiving and assisting in the pouring of the concrete being delivered by said crane and said Earl Smith was at the said time and place acting in the line and scope of his employment by Mitchell & Nall, Inc.

"The plaintiffs further aver that the said defendants, C. Pierson Cosby and John J. Smedley so negligently operated or maintained said crane at said time and place and the said defendant, Alabama Power Company so negligently caused or allowed said electric wires, line or lines to become or remain in a dangerous or unsafe condition at said time and place that said crane came in contact with or in such close proximity to said wire or wires, line or lines and that by reason thereof and as a proximate result and consequence of the aforesaid negligence of the defendants, a deadly current of electricity from said electric power wire, line or lines was caused to pass through the said crane or a part or parts thereof into the body of the said Earl Smith.

"Plaintiffs aver that the negligence of the defendants, C. Pierson Cosby and John J. Smedley as aforesaid and the negligence of the defendant, Alabama Power Company, as aforesaid united or concurred in proximately causing the death of the said Earl Smith.

"The plaintiffs further aver that at said time and place the said Earl Smith, deceased, was an employee of Mitchell & Nall, and that his death was caused by an accident arising out of and in the course of his employment; and that the said Earl Smith, deceased, and his employer at said time and place were subject to the provisions of the Alabama Workmen's Compensation Act and the plaintiffs and the said employer have agreed upon the compensation payable under the Workman's Compensation Act, and that the said Earl Smith, deceased, left surviving him three children, William Earl Smith, age, to-wit 15; Bobbie Jean Smith, age, to-wit 13; and Alice Sylvia Smith, age, to-wit 7 and his widow, Carrie S. Smith, who were dependent upon him for support, and that this action is brought by the plaintiff Carrie S. Smith for the benefit of herself as the dependent widow and by the said minor and dependent children of the said Earl Smith, deceased, by and through their mother and next friend, Carrie S. Smith."

The Power Company's insistence is that Count E(1) is demurrable because plaintiffs have not alleged that the Power Company, "in the exercise of reasonable care, should have anticipated that persons, or things that such persons were carrying or han-

dling, would come in contact with the Company's electric lines, as the facts of the case show that no person, or an object being carried or handled, came into contact with such line." As we understand the brief, the Power Company insists that the complaint fails to show a duty on its part to anticipate that the decedent, Smith, or anyone else, was likely to come in contact with the power line. The Power Company appears to insist that the complaint should have alleged that the Power Company had notice, actual or constructive, that the crane would be used, as it was used, in proximity to the power line. The complaint does allege that:

> "* * * the defendant Alabama Power Company was engaged in the business of distributing electric current and in connection with said business, maintained uninsulated wires or an uninsulated electric line or lines suspended in the air, charged with currents of electricity dangerous or deadly to the life or limb of human beings coming into contact or close proximity therewith, a short distance above and in close proximity to the place where the said Earl Smith, now deceased, was then working. The plaintiffs further aver that the said defendant Alabama Power Company then had knowledge or notice that said construction was being done in close proximity to its said electric power line or lines and that workmen employed in the construction of said building were working in close proximity to said electric power line or lines. * * *"

Count E(1) in the instant case is compared with Count 1 in Sullivan v. Alabama Power Company, 246 Ala. 262, 20 So.2d 224, it appears to us that Count E(1) is sufficient. In the Sullivan case, this court held Count 1 to be sufficient and on that authority we hold the instant Count E(1) also to be sufficient.

*Affirmative Charge for Power Company.*

Refusal of the affirmative charge with hypothesis requested by the Power Company is assigned as error.

The argument is that plaintiffs failed to prove actionable negligence on the part of the Power Company because "the record shows a *complete* absence of evidence of notice of the use of a crane in this construction." The argument of the Company appears to be that the use of the crane may have rendered the 2400-volt lines dangerous to workmen on the roof, but that the lines were not shown to be dangerous in the absence of the crane, and, because it was not shown that the Power Company had actual notice of the use of the crane or, under the circumstances, ought to have anticipated its use, there was a failure to show any breach of any duty on its part which proximately caused the death of Smith.

duty of one who maintains a power line has been stated as follows:

> "* * * '"The duty of an electric company in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, *wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith.* This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them." Curtis on Law of Electricity, § 510.' [Dwight Mfg. Co. v. Word] 200 Ala. [221] 224, 75 So. 979, 982." (Emphasis Supplied) Alabama Power Company v. Cooper, 229 Ala. 318, 320, 156 So. 854, 856.

electric company is not an insurer nor is it under obligation to so safeguard its wires that by no possi-

bility can injury result therefrom. Its duty is to exercise that degree of care commensurate with the danger involved. (Citations Omitted)" Alabama Power Company v. Berry, 254 Ala. 228, 233, 48 So.2d 231, 235.

See also: Alabama Power Company v. Irwin, 260 Ala. 673, 72 So.2d 300.

The familiar rule is that when the affirmative charge is refused and the party who requested the charge appeals, the entire evidence is viewed in the light most favorable to the opposite party, and where reasonable inferences may be drawn adverse to the party who requested the charge, the action of the trial court in refusing the charge must be affirmed. Louis Pizitz Dry Goods Company v. Harris, 270 Ala. 390, 118 So.2d 727.

The evidence does not show that the Power Company had actual notice that the crane would be used. The crane came onto the job site the morning of the accident and we do not think that it can be fairly said that the Power Company, in the discharge of its duty of reasonable inspection, ought to have discovered the presence of the crane. On the other hand, we are of opinion that certain tendencies of the evidence do support a reasonable inference that the Power Company had notice that workmen would be rightfully present and employed in dangerous proximity to its 2400-volt line, that in failing to guard against injury to such workmen the company failed to exercise that degree of care commensurate with the danger involved, and that the failure to exercise such care was a proximate cause of Smith's death.

As we understand the record, three high voltage wires crossed the roof at a height of fifteen feet three inches above it. Each of these wires was the same height, they were separated horizontally, and contact with any one of them by a person connected to the gound was dangerous to human life. Below these three wires, and from the same poles, three additional wires were strung across the roof. One of the additional wires, called a common neutral, carried no voltage. It was two to two and a half feet below the three high voltage wires. About two feet below the common neutral was the second additional wire which was not carrying any voltage at the time of the accident. The third additional wire was a telephone wire not dangerous to human beings. It appears to have been less than a foot above the roof.

The high voltage line had been constructed several years prior to the commencement of construction of the new wing on the school building. A month or more before the accident, J. W. Breedlove, Jr., District Engineer for the Power Company, advised F. D. Kimbrough, job superintendent for the contractor, that the Power Company planned to retain the existing lines as they then were. Kimbrough testified that he had a conversation with Breedlove on the job site ten days prior to Smith's death, and that he, Kimbrough, asked if the high powered line was going to stay over the new wing, that Breedlove said yes, and that he, Kimbrough, said he did not like it and thought it was dangerous, and that Breedlove said he thought it complied with the law.

Kimbrough testified that steel rods used to reinforce the roof concrete were then "in plain view" on the job site; that the rods were of varying lengths up to forty feet; that use of such rods was customary in constructing such roofs; that Breedlove was on the job on subsequent occasions prior to Smith's death; that he stated to Breedlove that he, Kimbrough, "would like to have those wires removed."

Kimbrough testified that the steel rods were not a hazard. Mosley, consulting electrical engineer, testified that handling the longer rods would not constitute the same hazard as would handling the shorter rods, that a workman handling a 10 or 12-foot rod might swing it up and get in contact with the dangerous wire. Mosley testified further that if the crane were eliminated

and the rods were properly handled there would be no danger from leaving the wires in place during construction, but he also testified that "There would have been a certain amount of danger in handling reinforced rods there," although, if the men had been instructed to handle the rods without holding them up in the air there would not be any danger there "With the exception of human error."

Mosley testified that two precautions could have been taken to render the wires less dangerous, to wit, keep the crane away from or deenergize the wires, and that deenergizing was not difficult. He further said it is a common practice to use cranes on such construction jobs. Kimbrough also testified that cranes were commonly used by contractors on such work.

Mosley testified that the high voltage lines complied with the "National Safety Code" in that they were more than eight feet above the roof, but also said that the Code "does not take into consideration men working under the wires."

"Our recent case of Housing Authority of Birmingham Dist. v. Morris, 244 Ala. 557, 566, 14 So.2d 527, otherwise states the applicable rule as follows: If common experience has demonstrated that dangers lurk in the method adopted or in the instrumentality maintained by a person he rests under the obligation of ascertaining the peril and taking precautions to avoid injury therefrom.

"And, ordinarily, culpability for dereliction in this regard is a jury question, determinable under the particular circumstances. Briggs [v. Birmingham Ry., Light & Power Co.] case, supra, 188 Ala. [262] at page 270, 66 So. [95] at page 97." Sullivan v. Alabama Power Co., 246 Ala. 262, 268, 20 So.2d 224, 228.

"'When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court.' (Citations Omitted.)" Alabama Power Company v. Irwin, 260 Ala. 673, 676, 72 So.2d 300, 302.

We are of opinion that the evidence in the instant case is such that reasonable men may fairly differ on the question as to whether or not the Power Company was negligent in failing to anticipate and guard against the injury to Smith, and that it cannot be fairly said that the only reasonable conclusion to be drawn is that Smith's injury could not reasonably have been anticipated.

We do not think the evidence reasonably requires exclusion of the inference that injury to workmen from handling the steel rods on the roof or from the use of the crane should have been anticipated. Mosley's testimony is to effect that there was danger of electrocution of workmen handling the rods on the roof. There is evidence that Breedlove, the Power Company's engineer, was on the premises when the rods were in plain view. Use of rods on such construction was said to be a common practice. We think the evidence reasonably supports an inference that the company should have anticipated danger from the rods.

There was testimony by Mosley and Kimbrough that cranes were commonly used in such construction. We do not think it can be fairly said that the jury could not reasonably infer that the Power Company should have anticipated use of the crane.

The exhaustive briefs filed on behalf of the Power Company cite a number of cases where injury or death resulted from a crane coming into contact with a power line. The cited cases hold that the defendant power company in those cases was not liable. We have carefully examined all of them but do not think a detailed statement concerning

each case would serve any useful purpose. These cases appear to turn either on the holding that the power company was not, under the facts shown, under a duty to anticipate the use of a crane or on the holding that negligence in maintaining the wires was not the proximate cause of the injury and that operation of the crane was the proximate, independent, intervening cause. A New York case is typical of these holdings. A workman who was laying a sewer was killed when a crane came in contact with overhead wires. The Appellate Division of the Supreme Court of New York, in affirming dismissal of the complaint against the power company said:

> "* * * The negligence of the power company has not been demonstrated. No notice coming to it that the decedent's employer Stage would use a crane with a boom long enough or in such manner as to come in contact with high tension wires 33 feet above the ground has been demonstrated. The mere fact the utility company knew a sewer was being laid near its poles is not enough to cast on it foresight of this kind of an occurrence." Mikolasko v. New York State Electric & Gas Corporation, 8 A.D.2d 648, 185 N.Y.S.2d 95, 96.

The cases cited by the power company, as we understand them, apply the same test which we undertake to apply here. The courts in those cases concluded that the power company was not bound to anticipate the danger.

A different result was reached by the Court of Appeals of New York in an action for wrongful death of a workman which occurred when the cable of a crane came in contact with a power line. The workman was directing the cable which was being used to unload structural steel from a truck. The steel was for use in a building there being constructed. The Court of Appeals reversed the Appellate Division and held that the issue of whether or not the defendant power company was negligent in failing to protect workmen from its wires was for the jury. The New York Court of Appeals said:

> "* * * When a representative of that defendant called at 950 Georgia Avenue on December 13, 1949, he observed there the unloading of building materials and noticed the completed installation of a number of footings on which the overhead structure was to rest. The defendant Consolidated Edison Compa(n)y was not unaware of the common use of cranes and booms in the erection of buildings and, in the opinion of a witness who was a member of its engineering staff, the use of an 80-foot boom on the occasion in question was not at all extraordinary. A division engineer in the company's transmission and distribution bureau testified that its Georgia Avenue high tension wires could have been de-energized by other equipment in the company's possession.
>
> "Even so, the defendant Consolidated Edison Company says it was entitled to 'actual notice' of the time when a crane would be in operation at 950 Georgia Avenue and the Appellate Division so held. We cannot adopt that idea, because (as we have seen) the defendant Consolidated Edison Company had full, exact and early information of the nature of the building operation that was being carried on at 950 Georgia Avenue and thus that company had been warned of the probability that workmen erecting the overhead structure there would perchance be exposed to the undisclosed deadly peril which caused the death of the intestate. In these circumstances, the defendant Consolidated Edison Company was bound to ascertain the time when the work of building the overhead structure at 950 Georgia Avenue was to begin, in order to enable itself to protect workmen against the danger that was there hidden in its high tension wires—or so a

jury could find (Citations Omitted.)." Pike v. Consolidated Edison Co. of New York, 303 N.Y. 1, 99 N.E.2d 885, 886.

An annotation on the liability of electric power company for injury resulting from contact of crane or other machine with electric line appears in 69 A.L.R.2d 93. Cases are listed in which liability has been upheld, in which liability has been denied, in which negligence was held to be a question for the jury, and in which it was held that the power company was not negligent as a matter of law. See Kingsport Utilities v. Brown, 201 Tenn. 393, 299 S.W.2d 656, 69 A.L.R.2d 87, there annotated.

In the case at bar, for the reasons we have undertaken to show, we are of opinion that the jury could infer that the power company, in exercise of care commensurate with the circumstances, was bound to anticipate the probable danger to workmen from the wires over the roof where Smith was injured, and that this duty rested on the power company even though it had no actual notice that a crane would be used.

A question due to be considered in deciding the correctness of refusing the company's requested affirmative charge is whether or not the jury could find that negligence in maintaining the high voltage line was a proximate cause of Smith's death. We think that if the jury could find that the company was negligent in maintaining the wires as they were maintained (and we have already said the jury could so find), the jury could find also that such negligence was a proximate, concurring cause of the death.

It is true that Smith's death would not have occurred in the manner in which it did occur without the operation of the crane in the manner in which it was operated. The concurring cause, to wit, operation of the crane, was not the sole proximate cause of the death, or at least the jury could so find; and, as we view it, the jury could find that the operation of the crane did not break the causal connection between negligent maintenance of the wires and Smith's death. The jury could find that negligent maintenance of the high voltage wires was a continuing negligence endangering persons on the roof, without which negligence the injury would not have occurred. In all cases of concurring negligence, it may be said the one would not have produced the result without the other. If this be a defense, both would escape, although both be in the wrong. A present danger caused by present maintenance of wiring in a negligent manner concurring with present negligence of another, both creating the conditions causing the mishap, renders both liable. Alabama Power Company v. McIntosh, 219 Ala. 546, 122 So. 677.

We are of opinion that when the evidence is viewed according to the rule of Louis Pizitz Dry Goods Company v. Harris, supra, the Power Company's requested affirmative charge was refused without error.

*Affirmative Charge for Cosby.*

Appellant Cosby asserts that the court erred in refusing his requested, affirmative charge with hypothesis. Cosby's argument is that a verdict against him must rest on proof that Smedley, the crane operator, was acting within the line and scope of his employment as a servant of Cosby at the time of Smith's injury; that the evidence completely fails to show that Smedley was so acting; and, therefore, Cosby was entitled to his requested charge and its refusal was error. Cosby insists that Smedley was not Cosby's servant at the time of the injury but had become and was the servant of the contractor, Mitchell & Nall, Inc.

An employee may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that the employee becomes the servant of such third person with all the legal con-

sequences of the new relation. Whether one who is usually the servant of one master has become specially and temporarily the servant of another is ordinarily a question of fact. If, under the circumstances only one inference can be properly drawn, the court will determine the issue, but if reasonable men may fairly come to different conclusions respecting the inference to be drawn from the facts, the case will be one for the jury. United States Steel Corp. v. Mathews, 261 Ala. 120, 73 So.2d 239.

In the Mathews case, citation of authority and the rules to guide determination of the issue are set out. The result will be determined by answer to the questions: Whose work was the servant doing and under whose control was he doing it? It is the reserved right of control rather than its actual exercise that furnishes the true test of relationship. He is master who has the supreme choice, control, and direction of the servant and whose will the servant represents in the ultimate result and in all its details. There must be careful distinguishing between authoritative direction and control, and mere suggestion as to details or the necessary cooperation where the work furnished is part of a large undertaking. The fact that the borrower gives information and directions to the servant as to details of work or the manner of doing it does not make this general servant of the employer the servant of such other person. Where the evidence does not clearly establish who the employer is, consideration must be given to the character of the service to be rendered, the duration of employment, and the one who is paying the employee. United States Steel Corp. v. Mathews, supra. It seems axiomatic that all competent, relevant, legal evidence tending to prove or disprove the issue should be considered and that each case must be determined on its own facts.

Much of the language of the preceding paragraph is found in The Standard Oil Company v. Anderson, 212 U.S. 215, 29 S. Ct. 252, 53 L.Ed. 480, a much cited, leading case, where pertinent principles are considered at length. In that case the court considered the question whether a servant of defendant had become the servant of a contractor who had undertaken to load a ship for the defendant. To accomplish the work, an employee of defendant operated a winch of the defendant. Negligent operation of the winch caused plaintiff's injury. The court held that the winchman remained the servant of defendant.

The many cases cited by able counsel have been carefully considered. Discussion of each case would be of little value. The question here presented, simply put, is does the evidence support any reasonable inference that the crane operator was the servant of Cosby, or provide a scintilla of evidence to support such inference? The general rule of the loaned servant doctrine is certain and easy; the difficulty arises in applying the facts of a given case to the rule. Pearson v. Arlington Dock Company, 111 Wash. 14, 189 P. 559. Annotation on liability for acts of operator furnished with leased machine is found in 17 A.L.R.2d 1388. The cases there cited reach varied results.

Evidence favorable to plaintiff was presented as follows: Kimbrough testified that he "contacted Mr. Cosby" and asked Cosby "where and how we might get a crane and bucket to pour that roof," and Cosby told Kimbrough that he, Cosby, had a crane and would rent it to pour the roof, that "He had a competent crane operator that would come with the crane, who had operated it for a good many years"; that Kimbrough did not request any particular operator and had never seen Smedley before; that the conversation with Cosby took place in the schoolyard probably a month or more before the accident; that Kimbrough called Mr. Cowan, an employee of Cosby, one or two days prior to the accident; that Cowan came out on the job and went up on the roof with Kimbrough who pointed out to Cowan "what we had to do there to get the concrete poured."

Carmichael, manager of Cosby's sand and gravel business, and also interested in Cosby-Carmichael Transit Mix Company, testified that Cosby was supplying sand and gravel, and the Mix Company was supplying concrete, to the contractor; that Cosby leased cranes periodically, he, Carmichael, supposed several times a year; that Smedley was their "regular" crane operator; that Smedley is the only person authorized to operate that crane on the Mitchell & Nall job; that Smedley is the operator that goes with the crane; that on this same job he had rented a bulldozer to Mitchell & Nall, and the bulldozer was leased with an operator; that operation of the crane requires a "man with skill and a specialty"; that the crane cost between twenty and twenty-five thousand dollars; that crane and operator were rented for $100.00 per day; that the total charge to the contractor for crane and operator was $460.00, being four days' rent, $40.00 for moving crane and $20.00 for moving bucket and extension.

Kimbrough further testified that he had never operated a crane, and did not have knowledge as to how to operate a crane; that Kimbrough told Smith to work out signals with Smedley and Smedley said "he would instruct Mr. Smith how to give those signals, what signals to give for a certain movement of the bucket and so forth"; that no one told Smedley where to place his crane and placing the crane after he started to work on the building was "left entirely up to" Smedley.

Smedley was paid by Cosby. Mitchell & Nall, Inc. paid Smedley nothing. Cosby carried Smedley on his records as an employee for tax purposes at the time of injury. Smedley had been Cosby's employee since 1951, and was still Cosby's employee at the time of trial. Cosby provided the gas and maintained the crane when it was leased. It was Smedley's job to maintain the crane and keep it up. A man not skilled in operating a crane could not with safety and good sense operate one. Smedley did nothing on that job other than operate the crane hauling concrete to the roof, which was what Cosby had told Smedley he would be doing.

It is, of course, clear and as we understand it, undisputed that Cosby was the general master of Smedley. The only question is does the evidence justify a finding that Cosby had not lost the right to control Smedley in operating the crane on the job. We are of opinion that the evidence justifies an inference that Cosby had a reserved right of control over Smedley at the time of the injury. This, we think, is a case where the question of who was master was a question of fact and that reasonable men might fairly come to different conclusions respecting the inference to be drawn from the evidence. Jeffrey Mfg. Co. v. Hannah, 268 Ala. 262, 105 So.2d 672. Consequently, the issue was properly submitted to the jury and Cosby's affirmative charge was correctly refused.

*Exceptions to Oral Charge.*

The Power Company assigns as error three separate portions of the oral charge to which the company asserts it reserved three separate exceptions. The record discloses that the company undertook to reserve exceptions as follows:

"MR. VOGTLE: I want an exception to that portion of the Charge, that portion where you stated in substance that the jury could find the Power Company liable if workers or other persons were in proximity of said line. I would also like—

"THE COURT: I don't remember making that statement, but you may have it in there. I just can't remember everything.

"MR. VOGTLE: I would also—

"THE COURT: You mean the statement standing alone by itself?

"MR. VOGTLE: It was in substance that where they, you used the words, 'in proximity to said line,' is the expression, as I have it.

"THE COURT: Rightfully in proximity?

"MR. VOGTLE: Yes, sir.

"I would also like to except to the Court's oral charge in which he stated in substance that the Alabama Power Company or a utility must insulate its wires, among other things, where people are carrying things.

"That is all I have.

"THE COURT: All right."

The proper way to reserve an exception to a part of the court's oral charge is for the exceptor to select and recite what the court said, or state the substance of what the court said, and thus specifically bring to the attention of the trial court and this court the matter and ruling of which complaint is made. Pollard v. Rogers, 234 Ala. 92, 173 So. 881. An exception to "that part of the charge defining wantonness" is too indefinite to reserve an exception to the oral charge. Conway v. Robinson, 216 Ala. 495, 113 So. 531. We are of opinion that the attempt, as aforesaid, to reserve exceptions to the oral charge in the case at bar was likewise insufficient to present for review the alleged errors in the oral charge. Birmingham Ry., Light & Power Co. v. Cockrum, 179 Ala. 372, 60 So. 304; Birmingham Ry., Light & Power Co. v. Friedman, 187 Ala. 562, 65 So. 939; Bean v. Stephens, 208 Ala. 197, 94 So. 173.

*Plaintiffs' Charges 12 and 13.*

The Power Company and Cosby argue that the court erred in giving plaintiffs' requested Charges 12 and 13 which recite as follows:

"No. 12.

"I charge you, *gentlmen* of the jury, that the employer is responsible for negligent acts or *ommissions* of his employee *is* the course of his employment, and if you find from the evidence that John Smedley was an employee of C. Pierson Cosby while operating the crane at Hudson High School at the time Earl Smith was killed and that his operation of said crane was in the line and scope of his employment with C. Pierson Cosby, then C. Pierson Cosby would be responsible for any negligent acts or negligent omissions of John Smedley in the operation of said crane."

"No. 13.

"I charge you that the employer is liable for the negligence of his employees' acts within the line and scope of his employment, though not done under the employer's direction."

It is argued that these charges are bad because they omit any mention of proximate causation and instruct that the master is answerable for all negligent acts of the servant, whether such acts be the proximate cause of injury or not.

Charges 12 and 13 are not unlike portion 19 of an oral charge which was considered in Southern Ry. Co. v. Smith, 221 Ala. 273, 128 So. 228, and which recites as follows, to wit:

"19. 'A defendant would be held liable for the torts or wrongs done by its agent, servant or employee if at the time the tort or wrong was done the agent, servant or employee was acting within the line and scope of his employment as such agent, servant or employee.'" (221 Ala. at page 275, 128 So. at page 230)

Both Charges 12 and 13 and portion 19 in the Smith case, supra, are expressions of the doctrine of the master's liability for the acts of his servant, and all three statements omit mention of proximate cause.

We have noted that portion 19 is from an oral charge while Charges 12 and 13 are requested charges. As to portion 19, however, this court said:

"* * * The third, No. 19, is but the statement of an elementary principle which applied to most every tort action,

where the wrong is committed by an agent of defendant. Each contains no misstatement of law." (221 Ala. at page 278, 128 So. at page 232)

If portion 19 contains no misstatement of the law, then neither Charge 12 or Charge 13 contains misstatement of the law.

If, however, Charges 12 and 13 be deemed incomplete and, therefore, misleading, giving them was not reversible error. "It is not necessarily reversible error to give ambiguous or misleading charges; proper explanatory instructions should be given at request of party supposing himself prejudiced thereby." Birmingham Southern R. Co. v. Harrison, 203 Ala. 284, 291, 82 So. 534, 541. Concerning a given charge which allegedly imposed on defendant a duty greater than that required by law, this court said: "If defendant considered charge 7 to be misleading or not a full statement of the applicable law the remedy was to request explanatory or additional charges. In fact, it seems to us that several of the given charges requested by defendant, and also the oral charge, adequately dealt with the question of plaintiff's duty to exercise reasonable care for her own safety." First National Bank of Mobile v. Ambrose, 270 Ala. 371, 374, 119 So.2d 18, 21.

In the instant case, subsequent to giving plaintiffs' requested charges, the court gave at Cosby's request his Charge 16 as follows:

> "16. I charge you, Gentlemen of the Jury, that if you find from the evidence that the defendant, John Smedley, was not guilty of negligence which was a proximate cause of the electrocution or death of Earl Smith as averred in said complaint, then you must find your verdict in favor of the defendant, C. pierson Cosby.";

and at the Power Company's request its Charge 9 as follows:

> "9. I charge you that before you can return a verdict for the plaintiffs against Alabama Power Company in this case, you must be reasonably satisfied from the evidence that Alabama Power Company was guilty of an act of negligence charged in the complaint, as amended, and you must be further reasonably satisfied from the evidence that such negligence was a proximate cause of the injury suffered by the plaintiffs' intestate."

For the reasons stated, we are of opinion that the court did not err to a reversal in giving either Charge 12 or Charge 13.

*Refused Charges.*

1, 3, and 18 requested by Cosby and Smedley were refused without error because they were fairly and substantially covered by the oral charge and given charges. § 273, Title 7, Code 1940.

*Motion for Mistrial.*

Cosby and Smedley argue that the court erred in overruling their motion to declare a mistrial which occurred during the argument of counsel as follows:

> "THEREUPON, MR. HARRY GAMBLE ARGUED TO THE (JURY) IN BEHALF OF DEFENDANTS COSBY AND SMEDLEY. During the course of said argument the following occurred:
>
> * * * * * *
>
> "MR. GAMBLE: You have the power to take property from Mr. Cosby that he worked for and earned and give it to the plaintiff.
>
> "MR. HOBBS: We object.
>
> "If he wants to go into where the money comes from, we will meet him on it. He says something about taking property from Mr. Cosby, the defendant.
>
> "MR. GAMBLE: We move that the Court take the case from the jury. He indicated somebody else will pay it.

"MR. HOBBS: We object. I would submit that under the law it is not proper to make an argument to the jury on the basis of property being taken away from the parties in the case.

"THE COURT: What was the statement specifically you object to?

"MR. HOBBS: As I recall the statement, he was arguing to this jury that this jury had the power to take property away from Mr. Cosby he had worked for and earned and give it to the plaintiff. But he was urging the jury not to take property away from Mr. Cosby he worked for and earned.

"MR. GAMBLE: He further indicated he wouldn't, Mr. Cosby wouldn't have to pay it.

"THE COURT: I overrule. As I understand the argument, what you say is nothing more than they have the power to give damages.

"MR. GAMBLE: I said that they had the power if they wished to take property from Mr. Cosby and give it to the plaintiff.

"THE COURT: I overrule Mr. Gamble's motion for a mistrial at this time.

"MR. GAMBLE: We except.

"MR. PITTS: We want to except to that. * * *." (Par. Added.)

The particular language which appellants assert to be prejudicial is as follows:

"If he wants to go into where the money comes from, we will meet him on it. He says something about taking property from Mr. Cosby, the defendant."

Appellants insist that appellees' remark is highly prejudicial "since it could have no other meaning than that the defendant himself would not have to pay whatever damages were awarded, but rather that the money would come from an insurance company."

W do not agree that the statement about going into where the money comes from can have no meaning other than a reference to Cosby's insurance. Cosby's counsel had made a reference to taking Cosby's "property" that he had "worked for and earned." Appellees argue, and we think correctly, that the remark of appellees' counsel about "where the money comes from" can fairly be interpreted to be a challenge to investigate the source of Cosby's property, that is, whether he had acquired it by his own efforts or by gift or inheritance.

In Cosby's reply brief, suggestion is made that plaintiffs' counsel well knew that Cosby had earned his money, not inherited it, and that the meaning now given to the objectionable language by plaintiffs was not in the mind of plaintiffs' counsel when he made the statement. The record sheds no light on this point, and properly so, because how Cosby acquired his property or who would pay the judgment were not issues in the case. For aught that appears, the language now in question is as easily susceptible of the meaning given to it by plaintiffs as of the meaning given to it by defendant, Cosby. We do not agree that the statement here is subject to the same vice as the statement in Colquett v. Williams, 264 Ala. 214, 221, 86 So.2d 381, 386, where counsel for plaintiff referred to defendant's testifying "that his insurance company took a statement from him," and asked the jury whose money is the plaintiff trying to get.

Examination of the entire record leaves us with the impression that insurance was not injected into this case by the plaintiffs. Appellants say in brief that this record will show "there was no evidence whatever regarding insurance." That appears to be the case so far as insurance to protect defendants is concerned. In the cross-examination of the widow, by appellants' counsel, there is mention of an insurance

company as paying workmen's compensation to the widow. On re-direct examination of defendant, Smedley, he makes a reference to "the insurance company for Mitchell & Nall." On direct examination of defendants' witness, Cowan, he also refers to U. S. F. & G. Company as Mitchell & Nall's insurer.

With respect to remarks of counsel, much discretion is allowed the trial court; Phillips v. Ashworth, 220 Ala. 237, 241, 124 So. 519; and the appellate court will not interfere where this discretion is not abused; Southern Ry. Co. v. Jarvis, 266 Ala. 440, 446, 97 So.2d 549. We are of opinion that abuse of discretion does not appear in the instant case and that the court did not err in overruling the motion for mistrial.

*Excessiveness.*

All defendants argue that the court erred in overruling that ground of the motions for new trial which asserts that the verdict for $75,000.00 is excessive.

The rules which govern review on this point are well understood. The practical application of this rule by appellate courts to verdicts challenged for this alleged vice is a matter of great difficulty as well as delicacy. Central of Georgia Railway Co. v. White, 175 Ala. 60, 62, 56 So. 574. The trial court refused to disturb the amount of the verdict and the presumption attending the verdict is thereby strengthened. When such is the case, the appellate court is very reluctant to substitute its judgment for that of the jury and court below unless the amount is so excessive as to indicate passion, prejudice, corruption, or mistake on the part of the jury. Liberty National Life Insurance Company v. Weldon, 267 Ala. 171, 100 So.2d 696, 61 A.L.R.2d 1346; Airheart v. Green, 267 Ala. 689, 104 So.2d 687. When the whole evidence is considered, we cannot say that the verdict is so excessive as to so indicate.

Appellants cite Central of Georgia Railway Co. v. White, supra, 175 Ala. at page 63, 56 So. at page 577 where this court quoted a statement to effect that, as a general guide, if the amount of a verdict is much above or greatly below the average, it is fair to infer, in absence of extraordinary features, that some improper motive has led the jury astray. Appellants further assert that it is common knowledge that the highest jury verdict in Wilcox County, prior to this one, was in a death case for $22,500.00. Without questioning the soundness of the quoted rule, we are of opinion that the rule does not require that the size of verdicts in the particular county of the forum be the limiting criterion as to the permissible amount. It would appear that the size of verdicts in adjacent territory, at least, might be considered, because this court, in the cited case, after stating the rule, proceeded to compare the amount of the verdict in that case with verdicts in eleven other states. Measured by out of state standards, the amount of the instant verdict is not immodest. It does not exceed the judgments in the Weldon and Airheart cases, supra. The concluding statement in the last cited case appears to be appropriate here:

> "* * * As jurors, or as independent critics, we might not hesitate to disapprove a verdict which dispenses damages with so lavish a hand as this; but, as an appellate tribunal, whose revisory powers are guided and controlled by clearly defined limitations, we do not feel authorized to set it aside, especially in the face of the refusal of the trial judge to do so." (175 Ala. 60, 68, 56 So. 574, at page 577)

The judgment is affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.