[No. 747-3.  Division Three.  March 26, 1974.]

JOHN AMANT, *Appellant,* v. PACIFIC POWER & LIGHT CO., et al., *Respondents.*

*David E. Williams* and *Rembert Ryals* (of *Critchlow, Williams, Ryals & Schuster*), for appellant.

*F. N. Halverson* (of *Halverson, Applegate, McDonald, Bond, Grahn, Wiehl & Almon*) and *Frank W. Draper* (of *Detels, Draper & Marinkovich*), for respondents.

GREEN, C.J.—Plaintiff, John Amant, appeals from an order dismissing his complaint against defendants, Pacific Power & Light Co. (hereafter called "PP&L"), and Gray & Osborne, consulting engineers, upon their motions for summary judgment. While the record does not reflect the court's reasoning in granting the summary judgment, the briefs on appeal indicate that it was based upon two grounds: (1) plaintiff did not present sufficient facts to raise an issue as to defendants' negligence; and (2) plaintiff was guilty of contributory negligence as a matter of law. The propriety of the court's ruling creates the only issue on appeal. We reverse.

██ In ruling on a motion for summary judgment, the court must consider all material evidence and all reasonable inferences therefrom most favorably to the nonmoving party and, when so considered, if reasonable men might reach different conclusions the motion should be denied. The court's function is to determine whether a genuine issue of material fact exists, not to resolve the issue. A material fact is one upon which the outcome of the litigation depends. The moving party has the burden of proving that there is no genuine issue of material fact. *Balise v. Underwood*, 62 Wn.2d 195, 199, 381 P.2d 966 (1963).

The record upon which the summary judgment was based consists of affidavits, depositions, answers to interrogatories and the pleadings. This record construed in a light most favorable to plaintiff discloses the following facts. In 1967, the City of Yakima entered into a contract with Gray & Osborne, consulting engineers, to perform professional services in connection with the construction of a water transmission line, 5 or 6 miles in length, near Yakima. Actual construction of the pipeline commenced in the spring of 1969. Riverside-Lord Construction, Inc., a general contractor, installed the pipeline under the general supervision of and according to designs and specifications prepared by Gray & Osborne.

The pipeline right-of-way was bordered on one side by

PP&L's overhead electrical transmission lines. These lines were approximately 28 feet above the ground suspended from poles located about 18 feet from the pipeline ditch. One witness indicated the power line extended about 2 feet into the pipeline right-of-way. Bordering the other side of the right-of-way was a railroad track and adjacent to the railroad track was a public highway. Concrete pipes were delivered to the site by trucks. These trucks parked parallel to the highway near the railroad tracks where a 25-ton mobile crane with a 50-foot boom removed the pipe from the trucks. Plaintiff, employed by Riverside-Lord, fastened a choker line from the crane to the concrete pipe. The crane placed the pipe between the railroad tracks and the pipeline right-of-way along a trench excavated by a back-hoe. An attachment on the backhoe would lift the pipe into the trench.

On the early morning of September 26, 1969, a concrete irrigation gate, weighing 500 to 600 pounds, was found in the pipeline trench. Riverside-Lord's foreman directed that the 25-ton mobile crane with a 50-foot boom be utilized to remove the obstruction. Plaintiff proceeded into the trench with the choker line. As he was hooking the line to the concrete gate, he received a severe electrical shock. It is unclear from the record whether the boom actually touched the power line or whether the electrical current arced from the power line to the boom and down the choker line to the plaintiff. Gray & Osborne's field inspector arrived at the scene just as the accident occurred.

██ First, was summary judgment properly granted in favor of PP&L upon the ground that no issue of fact existed as to its negligence? The standard of care of an electric company was set forth in *Scott v. Pacific Power & Light Co.,* 178 Wash. 647, 650, 35 P.2d 749 (1934), in a quote from Croswell, *Law of Electricity* § 234, at 205-06.

"Electric companies are . . . bound to use reasonable care in the construction and maintenance of their lines and apparatus, that is, such care as a reasonable man would use under the circumstances, and will be responsi-

ble for any conduct falling short of this standard. It follows from this rule, that the amount of care necessary varies with the danger which is incurred by negligence, for a prudent and reasonable man increases his care with the increase of danger. If but little danger is incurred, as, for instance, when the wires carry only a harmless electric current, such, for instance, as the telegraph or telephone current, only ordinary care may be required. While if the wires carry a strong and dangerous current of electricity, so that negligence will be likely to result in serious accidents, and perhaps death, or if a harmless wire is in dangerous proximity to a high tension wire, a very high degree of care, indeed, the highest that human prudence is equal to, is necessary. This is particularly true of electric light . . . wires, which carry a high tension current often of great danger. . . . The question of whether or not reasonable care has been used is in all cases for the jury, except where the court, on undisputed facts, can say that no reasonable man would have acted in the manner complained of, or that a reasonable man must have acted in the manner complained of. Between these limits the whole question is for the jury.

See *Wray v. Benton County PUD,* 9 Wn. App. 456, 458, 513 P.2d 99 (1973), and cases cited therein.

Responding to an interrogatory about prior contacts between Riverside-Lord cranes and its power line during construction, PP&L stated:

*On May 23, 1969, the mobile crane involved in the accident of September 26, 1969,* owned by Riverside Construction struck and damaged Pacific's primary conductor. . . . While moving the crane from one location to the other while the boom was in an erected position, Riverside Construction, Inc. ran into our powerlines causing them to burn down. Pacific learned of this incident on May 23, 1969.

On September 3, 1969, near the Naches Highway . . . a large track-type shovel, operated by Riverside Construction, contacted a 7200 volts to ground primary conductor causing the conductor to burn down. This accident was known to Pacific . . . September 3, 1969.

(Italics ours.) Phil A. Clark, line superintendent for PP&L, in an affidavit stated:

Prior to the Amant accident of September 26, 1969 I am aware of two prior contacts that Riverside-Lord made with power lines owned by PP&L. On May 23, 1969 *a mobile crane that was spotting pipe for placement in the trench* where the water line was being installed swung into a "tap line" that came off the 12KV four wire Y circuit. The tap line burned down and was repaired on the same day. . . . Then again on September 3, 1969, a back hoe contacted the 12KV four wire Y circuit causing the line to burn down.

(Italics ours.) After each incident, PP&L "advised and instructed the personnel on the job of the danger involved in contacting these power lines and of the regulation prohibiting them from operating equipment within ten feet of the power lines." Following the first incident, decals were placed upon the crane stating that it should not be operated within 10 feet of a power line.

Several alternative safety measures could have been taken by PP&L to protect the workers engaged in the pipeline construction. John F. Lane, a purported expert, in an affidavit filed on behalf of plaintiff, outlined these measures as follows: (1) de-energize the line; (2) raise the lines beyond the reach of equipment by using extensions on existing poles; (3) guard or insulate the line by use of plastic or rubber insulation devices to prevent the construction equipment from coming in contact with the energized conductor; (4) place the lines on or below the surface of the ground away from construction activity by use of insulated high-voltage cable; (5) require personnel working with the crane to wear rubber gloves; and (6) provide a "baby-sitter" or "safety-watcher" to keep the crane under observation at all times to make certain that it maintained a proper distance from the line. The line, foreman for PP&L, in his affidavit, states that PP&L was never requested to utilize any of these safety measures and that the use of these measures was not feasible under the circumstances. Further, he stated the lines were constructed in compliance with safety requirements of the Department of Labor and Industries electrical code. PP&L asserts that its

compliance with the code and the warnings it gave to the contractor's employees adequately discharged its duty, if any, to the plaintiff.

We conclude that the warning given after the first accident and the happening of a second accident followed only by another warning, coupled with the feasibility of employing additional safety measures, raised a genuine issue of material fact. *See Black v. Public Serv. Elec. & Gas Co.*, 56 N.J. 63, 265 A.2d 129 (1970); *Mississippi Power & Light Co. v. Walters*, 248 Miss. 206, 158 So. 2d 2, 160 So. 2d 908 (1963); *Pike v. Consolidated Edison Co.*, 303 N.Y. 1, 99 N.E.2d 885 (1951); *Alabama Power Co. v. Smith*, 273 Ala. 509, 142 So. 2d 228 (1962); *see also Ahearn v. Florida Power & Light Co.*, 129 So. 2d 457 (Fla. App. 1961); *Ashby v. Philadelphia Elec. Co.*, 328 Pa. 474, 195 A. 887 (1938). The instant case differs from *Frisch v. PUD 1*, 8 Wn. App. 555, 507 P.2d 1201 (1973), and *Dunnaway v. Duquesne Light Co.*, 423 F.2d 66 (3d Cir. 1970), relied upon by PP&L, in that here PP&L had notice of two prior accidents, thus raising a question of fact as to whether its safety measures were adequate.

Second, was there an issue of fact as to the negligence of defendant Gray & Osborne? It is clear that Gray & Osborne knew of the two prior accidents, May 23 and September 3, 1969, one of which involved the same crane as the one in the instant case. Clem Dutra, job superintendent for Riverside Construction, in his affidavit stated that he attended a preconstruction meeting with representatives of Gray & Osborne and PP&L, where the hazard created by the power lines was discussed. Carl Julius, project engineer on this job for Gray & Osborne, in his affidavit stated that one of his functions was to evaluate the hazards involved in the construction job, which included the dangers created by the power line. The contract between Riverside-Lord and the City of Yakima, provided:

> Except where otherwise directly specified in the contract, the Contractor shall design, lay out, and be responsible for the methods and equipment used is fulfilling the Contract, *but such methods and equipment shall have the approval of the Engineer.*

(Italics ours.) Thus, Gray & Osborne possessed the power to approve the methods and equipment used by the contractor on the job. Additionally, this contract imposed upon Riverside-Lord a duty to provide for the safety of its workmen. Gray & Osborne's contract with the city imposed upon them a duty of inspection to insure that the contractor fulfilled the terms of its contract with the city, including necessarily the safety provision.

Harry Rehm, the field inspector on this job for Gray & Osborne, stated in his affidavit that Gray & Osborne had the power to shut down the job for safety violations. Additionally, he stated that if a safety violation occurred, he would tell the contractor to stop the unsafe practice.

Considering the evidence and all reasonable inferences therefrom most favorable to the nonmovant plaintiff, the extent of the duty of care owed by Gray & Osborne for the safety of the workmen and their discharge of that duty presents an issue of material fact. *Loyland v. Stone & Webster Eng'r Corp.*, 9 Wn. App. 682, 514 P.2d 184 (1973); *Miller v. DeWitt*, 37 Ill. 2d 273, 226 N.E.2d 630 (1967); *Nauman v. Harold K. Beecher & Associates*, 19 Utah 2d 101, 426 P.2d 621 (1967).

Finally, was the plaintiff contributorially negligent as a matter of law? On the day of the accident, plaintiff arrived on the job about 8 a.m. Shortly thereafter, the contractor's foreman directed that the crane, with which plaintiff was working, be moved to the trench and used to remove the concrete irrigation gate obstruction. After the crane was moved into position, plaintiff proceeded into the trench. Plaintiff described the events that transpired thereafter as follows:

Q Now, at the time it was set were you down in the ditch next to the piece of concrete?
A Yes, they lowered down the choker to me and I went about my business doing this. This concrete block I believe that it had a hole in it and I went through this hole in order to hook it.
Q Was there water in the ditch?
A Oh, yes.

Q Were you wearing boots?

A Yes. Well, I don't know whether I had boots or shoes on, but we were so used to being wet all through on that job, sometimes I wore boots and sometimes I wore shoes.

Q Mr. Amant, when you were down in the ditch and were getting ready to put the choker line around this piece of concrete, immediately prior to doing that did you form any opinion, or do you have any recollection as to how close the boom was to the high voltage lines?

A Well, there's no way to tell. If you look up and see a boom on your line it could be this close or it could be that far and you can't tell and you can't judge that close up in the air.

Q I don't want to hold you to an exact figure, but would it be fair to say that it was closer than ten feet to these high tension wires?

A I think—well. . . . I don't really know. It wasn't my job to watch that up there, it was somebody else's; it wasn't my responsibility to look and hook the choker and everything else, I had my job to do.

Q Can you give me any estimate either by your hands or the length of this room, or any estimate as far as how far that hook was from those wires?

A No. If I had known it had been close, I'd have got the hell out of there.

Q Is it my understanding you didn't feel that the boom was abnormally close to these high tension wires?

A I didn't think I was in any danger, but I had preached safety to those guys out there till it was running out of my ears about those lines, and I thought everybody kind of got the message. You can get hurt on them damned things.

Q Would it be fair to say that when you were down in the ditch and getting ready to put the choker line around this piece of concrete and up until the accident occurred, that you weren't concerned for your own welfare and safety, you felt everything was going along fine?

A Well, I had worked with these men, and you have to have trust in other people if you are going to work with them, and I had no idea that nothing was going to happen.

Q Then what happened after you put the choker line around the piece of concrete?

A Well, it was kind of hard to hook. If you ever hooked a choker you know they're hard to hook, and I hooked it, and I just got through hooking it, and another split second I'd be off of it, and I just took it with both hands, and that's all I remember, and all hell broke loose.

Q You hooked the choker line around or through the piece of concrete, and then you would have brought the end of the choker line that you had hooked on back around and hooked it around the choker line. Would that be—

A —No, you just hook it once. You got a little deal in here you hook the line through its hole, and there's a little thing there, and once you hook it through it falls into place and that's it, and I just hooked it and, bang.

Q If I understand your testimony correctly, you had just made the hookup and—

A —I didn't stand around there to do this or that. I just hooked it and I wasn't going to stand there holding it because anything can happen, you don't want to do that with a piece of concrete, you want to get out of the way.

Q After you hooked it did you give any signal to the crane operator at all?

A No, I just hooked it and, just like I say, another split second and I'd have been off of it and out of the way.

Q If I understand your testimony correctly, then, instantaneously almost after you had it hooked up you received this electrical shock. Would that be correct?

A Yes. It was one hell of a shock.

Plaintiff testified that he did not know whether the boom touched the line or whether the electricity arced.

■ PP&L filed a transcription of a tape-recorded interview taken on the day of the accident, in which the plaintiff was submitted to questioning as follows:

Q Okay. Now, did you—when you got down on the ground and started working with the slab, can you remember looking up to see if the cable was clear of the wire?

A You bet. It was—it was clear at the time, I knew it was close, a foot or better maybe, not much more than

a foot, I knew it was too close for safety, to really be safe, but like I said, you know—you work with those guys and you think they're safe.

Q You figure Harvey was watching it?

A Yah and he had—he was watching it for—after I got knocked out then I came to I remember Harvey saying that he got the crane off away from the wire, the crown of the crane. He—lowered it.

It is evident from a reading of the plaintiff's statements that he was not sure how close the boom was to the power line because he was down in the ditch attempting to put the choker line on the concrete slab. It is also evident that plaintiff was relying upon the crane operator and the oiler to keep the boom a safe distance from the power line. Whether plaintiff was contributorially negligent in relying upon the crane operator and others to keep the boom a safe distance from the power line creates an issue of material fact because different results might be honestly reached by different minds. *Anderson v. Red & White Constr. Co.,* 4 Wn. App. 534, 538, 483 P.2d 124 (1971). Additionally, an issue of fact was presented within the plaintiff's own statements as to whether he actually knew how close the boom was to the power line immediately before the accident. Although plaintiff indicated that it was within a foot or so of the power line in the oral tape-recorded statement given on the day of the accident, the jury was entitled to consider the fact that the trauma may have affected his judgment as to distance and the more accurate statement on reflection may have been the one that he subsequently gave on deposition wherein he stated that he did not know exactly where the boom was.

While the questions presented on all issues are close questions, we do not believe these issues should be resolved in a summary way. As the court said in *Meadows v. Grant's Auto Brokers, Inc.,* 71 Wn.2d 874, 881-82, 431 P.2d 216 (1967):

However complex and intricate plaintiff's problem of proof at the time of trial may be, plaintiff at this stage of the proceeding is entitled to all favorable inferences that ·

may be deduced from the varying affidavits. So viewing the affidavits, we are satisfied respondents have not met their burden of demonstrating the absence of a genuine issue of material fact. Mere surmise that plaintiff may not prevail at trial is not a sufficient basis to refuse her her day in court.

The order granting summary judgment of dismissal is reversed and the case remanded for trial.

McINTURFF, J., concurs.

MUNSON, J. (dissenting)—The feasibility of safety measures suggested by an expert witness for plaintiff would present a jury question as to the negligence by Pacific Power & Light, if it can be said that Pacific Power & Light had a duty to take further safety precautions. I would hold as a matter of law that no duty existed under the circumstances set forth by the majority; consequently there was no genuine issue of material fact concerning negligence by Pacific Power & Light.

The concrete gate in the ditch resulted in an on-the-spot decision to remove it by using the 25-ton mobile crane with a 50-foot boom. This was not the use to which the crane had previously been put, nor was it within its contemplated use. This was also not the type of use which had been involved in either of the two prior incidents involving equipment and defendant's line. The employees of the general contractor were aware of the location of the defendant's line, as well as the circumstances of the two prior accidents. Yet, when the decision was made to use the crane to remove the concrete gate—an uncontemplated use that could not be foreseen by Pacific Power & Light—employees of the general contractor did not so inform Pacific Power & Light to seek their advice, recommendations, or approval. When a spur-of-the-moment decision is made to utilize this crane in a manner not contemplated by the parties, I would find as a matter of law that Pacific Power & Light had no duty to examine existing safety precautions or take further precautions without being notified of the intended use.

As to the defendant Gray & Osborne, I would affirm the summary judgment for the same reasons. Defendant Pacific Power & Light is not a baby-sitter for the contractor's personnel. Without notice that the crane was to be put to this use, I would hold there was no duty owed by Gray & Osborne.

Petition for rehearing denied May 9, 1974.

Appealed to Supreme Court May 14, 1974.