299 S.W.2d 656 (1955)
KINGSPORT UTILITIES, Inc., B. & S. Welding & Supply Co.
v.
Lawrence BROWN.
KINGSPORT UTILITIES, Inc., B. & S. Welding & Supply Co.
v.
Arlon SHELTON.
KINGSPORT UTILITIES, Inc., B. & S. Welding & Supply Co.
v.
Billie DAVIS.
KINGSPORT UTILITIES, Inc., B. & S. Welding & Supply Co.
v.
Frank AUSTIN.
KINGSPORT UTILITIES, Inc., B. & S. Welding & Supply Co.
v.
Bobby WALLACE
Supreme Court of Tennessee.
March 11, 1955.
Filed March 1, 1957.
Penn, Hunter, Smith & Davis, Kingsport, for Kingsport Utilities, Inc.
Minter, McLellan & Tipton, Kingsport, Hodges & Doughty, Knoxville, and John R. Todd, Jr., Kingsport, for Welding & Supply Co.
*657 Harry L. Garrett, Kingsport, for Lawrence Brown.
Dodson & Dodson, Kingsport, for Shelton, Davis, Austin & Wallace.
SWEPSTON, Justice.
Petitions for certiorari have been filed by Kingsport Utilities, Inc., and B. & S. Welding & Supply Company, complaining of the action of the Court of Appeals by the majority opinion in affirming judgments in their behalf against these two petitioners for injuries arising out of electrical shock and burns when the cable of a crane either arced with a 12,000 volt line or came in contact with it, and injured these five workmen and killed the B. & S. foreman in charge of the job.
The line in question was constructed in 1949 by the Kingsport Utilities Corporation in an alley coming off Warpath Drive, which was then in the county but later, before the occurrence of this accident, was in the City of Kingsport. The structure runs the full length of this alley which is approximately 400 feet and consists of three-phase uninsulated copper wires, the primary wire conductors carrying 12,000 volts, and these wires were placed on arms extending from poles 29 feet high, and the wires at the point where the contact occurred were 25 feet above the surface of the alley.
The testimony and the pictures show that this alley is in a business section of the City and on one side of it there are several business buildings which back up to it. One of these buildings, which front on Johnson City Highway and back up to this alley, was occupied by Williams Machine Shop.
On July 15, 1952, and for several days prior thereto the B. & S. Welding & Supply Company had been engaged under contract with Williams Machine Shop in moving fixtures and machinery from this location of the Machine Shop to a new location 53 feet across this public alley and these five plaintiffs who were employees of Williams, were assisting B. & S. Company in moving the machinery. Most of the machinery was moved with a crane having a boom that was not long enough to come in contact with these wires, but on the evening of July 14th it was decided by Hiram Still, the general manager of the B. & S. Company, upon the recommendation of that Company's crane operator, Mr. Carr, that a larger crane would be necessary to move the remaining machinery. This larger crane, possessing a greater lifting power and having a boom 30 feet in height and mounted on an auto truck that gave it full length of about 35 feet, was brought from the B. & S. Company's place of business about two miles away and down the public street and into the alley, the boom being lowered so that it was successfully carried under or by all wires along the way.
Just before the accident a very heavy piece of machinery referred to as a "planer" had been moved out of the old building across the alley to the new building, and this movement was accomplished by placing the boom of the crane below the wires in a horizontal position.
The next piece of machinery to be moved was a heavy "lathe" weighing over 5,000 pounds. In preparation for this Mr. Still directed Mr. Carr, the operator of the crane, to raise the boom and cable to a vertical position which extended it to a height of 35 feet above the ground and which was, as indicated above, higher than the high powered wires at the lowest sag-point which was 25 feet. The heavy piece of machinery was skidded from its location in the old building to the doorway leading to the alley, a collar of steel rope was fastened to it and the shive of the pulley was attached to this collar. During this operation these five plaintiffs who were employees of Williams Machine Shop, being directed by Williams to do so, were assisting in steadying the heavy piece of machinery.
*658 The power line was located on the same side of the alley that these several buildings were on and the crane and the boom were located in the field across from Williams' old location and partly in the alley and the intention was to pull the piece of machinery out of the building and into the alley by having the boom cable go under the power lines. When the crane with its boom upright was placed in the position designated by Still, the boom was just two or three feet away from the power lines but, as above indicated, it was actually extending up about ten feet higher than the power lines. Mr. Carr, the crane operator, asked Mr. Still, "That won't be too close to those wires, will it?" To which question Still responded by shaking his head and giving the customary hand-signal to proceed. Carr and Still both knew that the overhead power lines were dangerous and these five plaintiffs knew the wires were up there because they were in the open; they were not in among trees or covered in any way, although perhaps none of them knew the voltage of the wires. When Still gave the signal for Carr to proceed, Carr tightened up on the winch causing the cable on the boom to become tense, whereupon a flash occurred and Still was killed and these five plaintiffs were seriously burned about the hands and feet. Carr testified that he did not think that the cable or boom ever touched these wires and that it arced when they were about a foot apart. On the other hand, the Utilities witnesses testified that an inspection afterwards of the wires and the cable gave evidence of having made contact.
I think it is clear enough that the negligence of the defendant B. & S. Welding & Supply Company was proved as alleged and that the petition for certiorari clearly should be denied as to them.
The negligence alleged against the Utilities was (a) failure to insulate these high-powered lines, (b) to have them a sufficient height above the surface of the alley so that it would not come in contact with or close to the machinery or equipment that was likely to be used along said alley for moving machinery or other purposes, (c) failure to give warning of the dangerous nature of the wires, and (d) that the Utility had reasonable grounds to anticipate that persons might be working around or with machinery or doing work in the alley which might, or was likely to place them near or in contact with the dangerous wires.
At the first trial of the case the jury was unable to agree and there was a mistrial. If there was no evidence to justify submitting the case to the jury as far as the Utility was concerned, then of course the motion for a directed verdict at the close of all the evidence should have been granted. The evidence on the second trial was about the same as that on the first trial except that on the first trial there was no evidence that cranes had been down this alley before this occasion, whereas there was affirmative proof to that effect on the second trial. We do not think that is material, however, to the point on which the case really depends.
The defendant Utility introduced the National Electrical Safety Code and the work on Installation and Maintenance of Electric and Communication Lines published under the authority of the U.S. Department of Commerce and the relevant tables in those works provide for a minimum vertical clearance of 20 feet on open supply lines carrying 750 to 15,000 volts in public streets, alleys or roads in urban or rural districts. The Court of Appeals majority opinion found that these are recognized as standard works and that it was testified that this construction was up to the highest standard of the art, and further stated that there is no evidence to the contrary. Also, that no attempt was made by the plaintiffs to show the Utility had knowledge that this use of a crane was contemplated by the parties or knowledge that on a former occasion the crane had been down this alley or that well-digging machines had been repaired at the rear of this Machine Shop in the alley. Also, that there is no ordinance *659 of the City of Kingsport or regulation of the State Utilities Commission with reference to the use of bare uninsulated transmission lines within the city limits. The majority opinion rejected the defense of independent intervening efficient cause and held that by reason of the fact that the area where plaintiffs were injured was an expanding business section and that from the numerous cases involving the use of booms, heavy machinery, etc., the defendant knew or should have known that with its wire uninsulated an accident similar to the one in question might result and that the jury might have found this defendant should have therefore foreseen the probability of such an accident happening, and that the case was properly submitted to the jury.
Judge Hale dissented on the ground that, while the safety code can have no effect as a legislative enactment, as is the case in some states where it has been adopted as law, it does establish standards which, if adhered to, should protect the complying Utility in the absence of any proof to charge it with knowledge of danger or reasonable apprehension to fear injury to persons who might be there for work, pleasure, or convenience.
We have read all the cases cited in the two opinions, as well as in the briefs, that are relevant to the particular question and get no particular consolidation from any of them because they go both ways. The case of Arkansas Power Light Co. v. Lum, 222 Ark. 678, 262 S.W.2d 920, cited by Judge Hale, is a case quite similar with respect to the way the accident occurred except that it occurred along a highway outside of the town where a crane was used in replacing culvert tiles where a bridge was to be replaced and the power line ran along the edge of the road right-of-way. A tile slipped and caused the cable on the boom to contact the power line. It was held no liability because no negligence in not having the wires insulated; but to our minds, that is a different situation from the present one occurring in an urban business area.
Mr. Holyoke, the engineer of the defendant who designed this installation and under whose direction it was installed, testified that he knew that this area is a business section and a public alley and he knew the Machine Shop was there and had heavy machinery in it, and he knew that heavy machinery could be moved with cranes, although it could be moved by other means also. Then too, of course, the defendant is charged with knowledge of it being a growing business section by reason of the fact that current is supplied by it to these business houses in that area. Also, we think it a matter of common knowledge for the last 15 years at least, that massive machinery and cranes with tall booms are more commonly used in construction work than other methods in excavating, road-building, bridge building, construction of office buildings, hospitals, etc.
It does seem, therefore, that it is at least a question of fact about which the minds of reasonable men might differ as to whether a utility is negligent in having such high-powered voltage in lines uninsulated, running through the business section of towns. Of course the law does not require that all lines be insulated at any particular place but only where persons are likely to be and have a right to be, for business, pleasure or otherwise. Judge Felts has covered the question of foreseeability in his opinion in Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S.W.2d 450.
This line, as stated above, was constructed in 1949, before this area was taken in the city and, while it may be true that there is no evidence to the contrary that it was constructed in accordance with the minimum standard of the Electrical Code and the high standard of the art at the time, the evidence is that this has been a growing section so that what was safe at the time of construction, would not necessarily be safe under changed conditions.
The cities of Knoxville, Nashville and Memphis have filed briefs amicus curiae, *660 complaining among other things, of the increased cost of more adequate insulation. When the likelihood of danger to human life is to be balanced against the cost of insulation, we do not think the latter is a very good argument.
We therefore deny the writ.