MARGARET BLACK, ADMINISTRATRIX *AD PROSEQUEN-DUM* OF THE ESTATE OF VERGES N. BLACK, a/k/a DAVID V. BLACK, a/k/a VIRGIL BLACK, PLAINTIFF-APPELLANT, v. PUBLIC SERVICE ELECTRIC AND GAS COMPANY, A CORPORATION, DEFENDANT-RESPONDENT.

Argued February 3, 1970—Decided May 4, 1970.

64

Mr. *John M. Blume* argued the cause for appellant (*Mr. Jac B. Weiseman* on the brief; *Messrs. Blume and Kalb,* attorneys).

Mr. *Herman H. Wille, Jr.* argued the cause for respondent (*Mr. Luke A. Kiernan, Jr.,* attorney).

The opinion of the Court was delivered by

FRANCIS, J. The decedent, Verges N. Black, met his death by electrocution allegedly caused by the negligent maintenance of a high voltage wire by defendant Public Service Electric and Gas Company. Thereafter this damage action was brought by plaintiff, Black's widow, as administratrix *ad prosequendum* under the Wrongful Death Act, *N. J. S. A.* 2A:31-1 *et seq.* Trial resulted in dismissal at the close of the plaintiff's case. However, on appeal the Appellate Division declared that the evidence adduced below was sufficient to create a jury question as to defendant's negligence and, consequently, ordered a new trial. *Black v. Public Service Electric & Gas Co.,* 98 *N. J. Super.* 366 (App. Div. 1968). On retrial, plaintiff presented the theory recognized by the Appellate Division as establishing a factual issue of negligence, and also renewed her claim (advanced and rejected on appeal after the first trial) that an additional basis of liability existed. This additional alleged basis of liability, to be discussed hereafter, was again rejected by the trial court. Thus, the case was sent to the jury for decision on the limited theory of liability which had produced the

earlier reversal. The jury returned a verdict for the defendant and the present appeal followed. This time the Appellate Division affirmed in an unreported opinion. We granted certification on plaintiff's petition. 54 *N. J.* 509 (1969).

The factual picture of the case is not complicated. Central Construction Company, decedent's employer, was engaged in installing a sewer under Route 1 near East Lincoln Avenue in Rahway, N. J. Some time prior to the fatal accident a tunnel had been dug under Route 1. On March 18, 1965, Black, a Central Construction Company laborer, was a member of a crew engaged in lining up pipes and rails preparatory to their installation in the tunnel. Performance of the task required the use of a large crane with a long boom, and the working crew consisted of three men, *i. e.*, two laborers, one of whom was Black, and a crane operator who was the foreman. The crane had been in the area nearby the tunnel for three or four weeks before the accident.

The evidence showed that defendant Public Service maintained poles on both the east and the west sides of Route 1. High voltage wires, installed by defendant, carrying electricity loads of 26,400 volts were attached to and ran between the poles at a height of 33 feet four inches above the ground at the point involved in this case. The pole on the east side of Route 1 bearing its highly electrified wire or wires was near the tunnel and in close proximity to the crane and the scene of the accident. The wires were not insulated and there were no signs or notices of any kind on the poles, on the wires or in the area to warn of the dangerous nature of the high tension lines. Moreover, as the first Appellate Division opinion noted there was ample evidence in the plaintiff's case (which need not be repeated here, see 98 *N. J. Super.*, at 375–376) from which it could be found that Public Service had knowledge of the work being done in, around and under Route 1 near the poles in question, and of the presence of the crane close to the poles.

It is undisputed that no notice or warning of any kind was given by defendant to Central Construction Company's employees, including Black, of the lethal nature of the load of electricity being carried by the wires or of the danger which would result from uninsulated or unprotected contact with them.

On March 18, 1965, the crane was in position close to the wire-bearing pole on the east side of the highway. Black and his fellow-laborer had hooked up a section of cast iron sewer pipe to the boom of the crane. This pipe was to be lifted and put in place on rails in the tunnel. The precise distance between the top of the crane and the wires at this time does not appear. The crane operator had worked around wires on other occasions and said he knew that the crane should not be operated closer than six feet from electric wires. He said also that just before the lifting operation the top of the crane was more than six feet from the wires, and further that Black and the other laborer indicated to him that the crane was free of the wires. He "assumed" that the lines were electric wires, but he had no idea they were of the high tension nature. As the crane was raising the pipe some part of the boom or cable touched or came in close proximity to the high voltage line. As a result Black, who was on the ground apparently guiding the pipe, came to his death by electrocution. Police officers who arrived on the scene shortly after the accident said the crane was at that time six inches to a foot away from the wire. An expert for the defense testified that he examined the wire and the end of the boom from an aerial truck, and in his opinion the two had come into contact.

At the retrial, plaintiff contended that under the circumstances of the case it was for the jury to say whether the exercise of due care required defendant Public Service to erect, post or attach signs on or near the poles or wires warning members of the public or employees of an independent contractor working in the area of the dangerous condition of the highly electrically charged wires. A request to

charge containing the substance of that contention was submitted to the trial judge who refused to so instruct the jury. Instead he removed the issue entirely from the jury's consideration saying in his charge that he had ruled "that the defendant Public Service violated no duty by not posting any signs on the poles and the wires in the area as contended originally by the plaintiff."

At the first trial, plaintiff had raised the same contention respecting the obligation of the utility to give warning of the danger by means of signs or notices on the poles or wires. In answer Public Service maintained that the industry standards for erection and maintenance of such high tension wires were established by the National Electrical Safety Code, and that the code imposed no such duty to warn with respect to the type of poles or wires which were involved in this case. It pointed out that the only requirement set out in the Code was that for overhead wires there shall be a clearance of 22 feet over public streets, alleys or roads in urban or rural districts and over driveways to residences and garages. Since the wires in question were 33 feet four inches above Route 1, defendant urged that no violation of the Code had been shown.

On the first appeal the Appellate Division agreed that no breach of any express requirement of the Code had been proved. But that fact was not regarded as dispositive of the plaintiff's case. The court held that since the proof in the case would justify a finding that Public Service knew or should have known of both the construction work being carried on in the proximity of its dangerously charged uninsulated wires, and of the presence of a crane with a long, high boom for probable use in connection therewith, it was for the jury to say whether the utility was negligent in failing to take reasonable precautions to avoid or prevent injury to the construction workers. It is significant to note the absence of any declaration in that opinion negating or excluding as a reasonably precautionary measure an obligation to post or attach notices or signs on the wire-bearing

poles warning members of the public or such workers that the wires were dangerously energized with electricity. Obviously whether due care required such notices or signs, or the de-energizing of the wires while the construction work was being done, or the temporary bypassing or relocation of the wires, or actual and express notice to the construction workers of the danger, or supervision of the crane operation by utility employees familiar with the danger, or some other action or precautionary measure, such as insulation, was left for development at the retrial.

Plaintiff concluded from the opinion that failure of defendant to attach signs or notices on the poles warning of the dangerous high tension lines was properly an issue for jury consideration at the retrial. As noted above that view prompted the submission of the request to charge that:

"When permission is given to suspend along a public highway a wire, so charged with electricity as to be dangerous to the public if they come in contact with it, this permission entails a duty to give reasonable warning of such danger and it is a question of fact for the jury to determine as to whether in this case the failure on the part of the defendant Public Service to erect signs warning of the danger in its wires constituted negligence on the part of the defendant."

In our judgment it was error to deny that request; it was likewise error to instruct the jury that Public Service had violated no duty owed to the decedent in failing to post warning signs "on the poles and the wires in the area * * *."

An uninsulated high voltage power line carrying a deadly current must be considered one of the most dangerous contrivances known to man. In the pursuit of its business by installing and maintaining such a line a utility company must use care commensurate with the risk of harm, i. e., a high degree of care, to others who in the course of their ordinary and lawful activities might suffer injury, death or damage therefrom. In the utilization of such deadly wires along, adjacent to, across or over public highways, streets or ways, or private property, the company must be aware not only of the killing quality of its high voltage

lines, but also of the need to adjust the degree of care exercised in its control and maintenance of such wires to the demands of commonly known technological advances in other forms of industrial and business development. It is no answer for a company engaged in the public sale of such a highly destructive agency as electricity to say that precautionary measures which may have been adequate to meet the test of due care 50 years ago, when the lines were installed, must be regarded as sufficient in a modern industrial society. *Black v. Public Service Electric & Gas Co., supra,* 98 *N. J. Super.,* at 373. For example, it is a matter of common knowledge, for the last 25 years at least, that massive machines, derricks, aerial towers and cranes with tall booms are regularly used in construction work. excavation, road building, factories and other types of buildings. It may also be noticed judicially that such mechanical and automotive devices move from place to place along our public highways and streets and also operate on or near to private property in proximity to overhead wires carrying a deadly current. In our view when a utility strings or maintains, in the manner described above, uninsulated wires carrying a lethal charge of electricity it must recognize that as an incident of modern industrial life equipment such as derricks, aerial towers and cranes with tall booms may in the course of their ordinary use come into contact with such deadly wires. And, even though an assumption is made that the average employee or laborer working on or about such high rise contrivances has or may have some notion that overhead lines running between poles carry some electrical current, it cannot be assumed in the absence of signs or notices or warnings of some reasonable type, that such a workman is or should be aware that the wires are high tension lines carrying such high voltage as to be a serious danger to life or limb if his employer's equipment makes contact with them. Further it would be unreasonable to say as a matter of law that such a workman should be aware that the derrick or crane or other equipment on

which he was working would upon contact with the wires act as a conductor of the lethal current.

██ Under the circumstances, when high tension uninsulated wires are strung or maintained in such position that contact may occur between them and cranes or like mechancial contrivances which are legitimately in the vicinity of the wires in the ordinary course of operation, we regard such contact with its accompanying danger as a condition or occurrence which is reasonably to be anticipated by the utility. Given the duty to anticipate such danger, the nature of the obligation to exercise care commensurate with the risk was explained succinctly by Justice (then Judge) Proctor in *Rapp v. Public Service Coordinated Transport, Inc.*, 15 *N. J. Super.* 305, 312 (App. Div. 1951), *aff'd* 9 *N. J.* 11 (1952): "When permission is given to suspend along a public highway a wire, so charged with electricity as to be dangerous to the public if they come in contact with it, this permission entails a duty to give reasonable warning of such danger." See also, *Beck v. Monmouth Lumber Co.*, 137 *N. J. L.* 268, 270, 274 (E. æ A. 1948); compare, *e. g., Black v. Public Service Electric & Gas Co., supra,* 98 *N. J. Super.,* at 373; *Nevis v. Pacific Gas & Electric Co.,* 266 *P.* 2d 213 (Cal. Ct. App.), *aff'd* 43 *Cal.* 2d 626, 275 *P.* 2d 761 (Cal. Sup. Ct. 1954); *Fairbairn v. American River Electric Co.,* 179 *Cal.* 157, 175 *P.* 637 (1918), and the same case on an earlier appeal, 170 *Cal.* 115, 148 *P.* 788 (1915); *Conowingo Power Co. v. State of Maryland,* 120 *F.* 2d 870, 873 (4 Cir. 1941); *Gladden v. Missouri Public Service Company,* 277 *S. W.* 2d 510, 515 (Mo. Sup. Ct. 1955); *Chatfield v. New York State Gas & Electric Corp.,* 57 *N. Y. S.* 2d 406 (Sup. Ct. 1944); *Kingsport Utilities, Inc. v. Brown,* 201 *Tenn.* 393, 299 *S. W.* 2d 656 (1955); *Rogers v. City of Chattanooga,* 39 *Tenn. App.* 176, 281 *S. W.* 2d 504 (1954). There can be no closing of the eyes to the hundreds of cases appearing in the reports of our sister states around the country where death or serious injury arose out of contact or near contact between high rise mechanical equipment

and uninsulated wires carrying deadly current. See, *e. g.*, Annotation, Liability of electric power company for injury or death resulting from contact of crane, derrick, or other movable machine with electric line, 69 *A. L. R.* 2d 93 (1960).

The *Fairbairn* case, *supra,* involved a 1910 accident that occurred when a hay-stacking derrick came into contact with an uninsulated highly charged power line which the electric company had strung at a height of 27 feet 8¾ inches along a public highway and across a lane connecting a farm with the highway. Plaintiff and others started to move a hay-stacking derrick from the farm along the lane to the highway. The top of the derrick's boom was 30 feet 4 inches from the ground. The men moving the derrick decided that by removing its rear wheel and thus lowering the boom about two feet the boom could pass safely under the power wire. This was done and the boom then passed, without contact, under the first wire which carried 25,000 volts. (The power line consisted of three wires transmitting a total of 44,000 volts.) But the electricity arced through the intervening space, passed down the boom cable, which plaintiff was holding, and into his body necessitating amputation of his left arm and both legs below the knees. The plaintiff did not know the wires were high power transmission wires, nor was he aware of the propensity of electricity, without contact, to arc or leap over intervening space when some conducting material was brought into close proximity to the wire carrying the current.

There was proof in the case that derricks of the type in question, *i. e.,* the boom of which was higher than the electric lines, were used by farmers in this area during threshing season. The Supreme Court of California said that, because of the highly destructive power of electricity when carried in quantities sufficient for power purposes, and because of the fact that it is not visible to the naked eye or apparent to the other senses, a company maintaining an electric power transmission line along or over a public highway or private road is required to exercise a high degree of

care in placing the wires so as not to interfere with traffic on the ordinary highway, and so as to avoid contact with and injury to any person or damage to any object which may reasonably be expected to pass under the wires. Therefore, the court continued, in the discharge of such duty the utility was required to make careful inquiry into conditions and customs of the country penetrated by its lines to ascertain the height of objects which might reasonably be expected to be transported into, along or across the road over which its lines ran.

In our judgment, the duty to anticipate the danger to a third person's employees from the physical circumstances described in the present case does not depend upon knowledge by the utility of the actual operation of the crane, etc. in the vicinity of the wires. The hazard being great, the duty to anticipate arises from the stringing or maintenance of the high tension wires along, adjacent to, across or over public highways, streets or ways, or private property. The duty to anticipate the danger being plain, the sequential duty to exercise care commensurate with the risk inevitably arises. Whether exercise of care of that quality requires the utility to post signs or warnings near or on the poles, or at intervals along the wires when the poles are separated by substantial distances, we regard as a question of fact for determination by the jury. (In situations where the facts would justify a finding of knowledge by the utility of the actual operation the obligation to exercise due care may well involve the taking of precautionary measures greater than or in addition to the posting of warning signs or notices.) If the jury decides that such signs or warnings were required, that failure to post them constituted negligence, and further decides that such failure was the proximate cause or a concurring proximate cause of decedent's death, plaintiff would be entitled to a verdict.

The fact that the National Electrical Safety Code (which had been approved by the Board of Public Utility Commissioners pursuant to *N. J. S. A.* 48:2–25)

did not require the posting of danger signs on the type of poles here involved cannot, as a matter of law, absolve Public Service from negligence. Such a Code is evidence of due care but is not conclusive on the subject. The care which must be exercised in the handling of a highly dangerous and destructive agency means more than the use of mere mechanical skill and approved mechanical contrivances or appliances or pursuit of methods of operation generally followed in the industry. It includes circumspection and foresight with respect to contingencies reasonably to be anticipated in the light of the current social, industrial and commercial ambience. Thus it has been said in cases involving electric wires that safety codes represent minimum standards and do not establish the complete duty of the utility under all circumstances. *Gladden v. Missouri Public Service Company, supra,* 277 *S. W.* 2d at 515; and see generally, *McComish v. De Soi,* 42 *N. J.* 274, 282–285 (1964); *Beck v. Monmouth Lumber Co., supra,* 137 *N. J. L.* at 273; *Adams v. Atlantic City Electric Co.,* 120 *N. J. L.* 357, 364 (E. & A. 1938).

The National Electrical Safety Code itself recognizes what the law says shall be its probative value. Rule 202 says that "the rules state the minimum requirements for spacings, clearances, and strength of the construction." A footnote is added to this rule:

"Some of these minimum values are exceeded in much existing construction; service requirements frequently call for stronger supports and higher factors of safety than the minimum requirements of these rules."

Rule 211 provides:

"All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."

The second Appellate Division opinion noted that the Code required the wires to be 22 feet above ground level

at the accident location, and that they were in fact 33 feet above ground level. The opinion suggests that, no deviation from the Code in that respect having been shown, the trial court properly refused to charge that the jury could find defendant negligent by reason of its failure to post warning signs on or in the vicinity of its high voltage line. And it pointed out, apparently as a significant circumstance, that "[n]o expert was called to testify that failure to have such signs constituted a deviation from standard." Such expert testimony if offered might well have been received to show that the use or posting of warning signs was standard practice in the electrical utility industry. But in our view it was not at all necessary. The hazard to life and limb arising from contact with the lethal wires under the evidence in this case was easily comprehended by the average juror without expert testimony. The conditions present before and at the time of the mishap and the danger associated with them were perfectly apparent and capable of analysis by any person of ordinary understanding. We think such persons acting in the capacity of jurors and comprehending the danger presented by the facts in this case, were competent to decide without expert testimony whether the duty to exercise care commensurate with the risk involved was satisfied when the utility failed to post warning signs on or near the poles or on the uninsulated wires themselves. See *Heyer v. Jersey Central Power, etc. Co.,* 106 *N. J. L.* 211, 214 (E. & A. 1929); *Krieg v. Timken,* 102 *N. J. L.* 307, 309–310 (E. & A. 1925); *New Jersey Traction Co. v. Brabban,* 57 *N. J. L.* 691, 694 (E. & A. 1895); *Cook v. State,* 24 *N. J. L.* 843, 852 (E. & A. 1855); *Morton's Adm'r v. Kentucky-Tennessee Light & Power Co.,* 282 *Ky.* 174, 138 *S. W.* 2d 345 (1940); *Robbins v. Minute Tapioca Co.,* 236 *Mass.* 387, 128 *N. E.* 417 (1920); *Swan v. Salt Lake and O. Ry. Co.,* 41 *Utah* 518, 127 P. 267 (1912). Or to put the issue affirmatively, in our opinion the average juror is qualified to decide in circumstances like those present here

whether due care by the utility required posting of the described warning signs.

The issue of defendant's liability here should be considered in two postures, both of which are presented by the facts. The postures are: (1) assuming defendant had no knowledge that decedent's employer was working with a high boom crane in the vicinity of the high voltage wires, was defendant nonetheless under a duty to post warning or danger signs on its poles or wires, or (2) assuming defendant had such knowledge, was there a duty to post the warning or danger signs. We have been referred to one case in New Jersey, *Manning v. Public Service Electric & Gas Co.*, 58 *N. J. Super.* 386 (App. Div. 1959), which holds that in the absence of notice to the utility of the performance of work which might bring a workman into contact with an uninsulated high voltage wire, which was strung higher above the ground than was required by the National Electrical Safety Code, no liability arose when an employee of an independent contractor, working on a scaffold, suffered an electric shock when a metal bucket used in his operation came into contact with the wire. The Appellate Division held that, in the absence of notice to the utility as required by *N. J. S. A.* 34:6–47.5 that work was to be performed within six feet of a high voltage line, or in the absence of knowledge of an operation which might result in contact with such wire, there was no duty to anticipate or foresee the workman's injury. Emphasis was laid on the fact that the poles and wires, which were of the type commonly in use, had been installed more than 50 years prior to the accident and that no evidence had been adduced to demonstrate that they had been a source of danger.

For reasons already stated as well as persuasive decisions to the contrary in other jurisdictions to be cited, we reject *Manning* as a controlling authority. We believe the just and appropriate rule to be that when uninsulated wires carrying a deadly current of electricity are placed on poles along, adjacent to or across public highways, streets or

ways, or private property, it is reasonably foreseeable that persons engaged in a lawful operation in the proximity of such wires may come into contact with them in the ordinary course of the work and suffer injury. In such circumstances, in our judgment a jury question is presented as to whether the company stringing or maintaining the wires is guilty of negligence if it fails to post conspicuous warnings of the hazard on or near the poles or on the wires. And the existence of the jury question in such circumstances does not depend upon knowledge by the utility of the particular operation in the vicinity of the wires.

In *Worley v. Kansas Electric Power Co.*, 138 *Kan.* 69, 23 *P.* 2d 494 (1933), a power line carrying 13,200 volts of electricity was authorized by the Public Utilities Commission to be built along a highway. By mistake or otherwise some of the poles were placed on an adjoining farm. No signs warning of the hazard of the uninsulated wires were posted on the poles or wires. Two or three days before the mishap in question the farmer built a silo 18 feet high and about two feet two inches away from one of the wires. The poles between which the wire involved was strung were 295 feet apart; at one pole the wire was 23.3 feet above the ground; at the next one the elevation was 24.7 feet. There was some sagging between the two poles which according to the testimony left the wire about two feet above the top of the silo. There was no evidence that the power company knew of the existence of the silo.

Davis, an employee of the farmer, was up on the top of the silo tramping loose, damp ensilage for fodder when he was electrocuted. It was unclear whether he had inadvertently or purposely touched the wire, or had accidentally fallen against it or had been shocked by his proximity to it without contact. A witness heard him gasp, looked up and saw that he was stiff and falling on the wire. There was testimony that there is danger in going within 3 to 10 to 12 feet of a wire carrying 13,200 volts, especially if the person is standing on a damp footing, as Davis was. There was no evidence that

either Davis or his employer knew that the wires were carrying such a high voltage or that proximity to them would be dangerous. The farmer testified that if he had known of the danger he would not have built his silo so close to them. He said also there were no tags or notices on the line warning him or anyone else unacquainted with the fact that the line carried a high and deadly voltage.

In the wrongful death action the power company showed that the line had been in that location for over six years, that it was not customary to insulate wires in rural areas, and that it had neither knowledge of nor reason to anticipate that anyone would erect a structure so close to the power line as to endanger the life or safety of anyone working on the structure. The company said also that, a duty to anticipate such conduct not existing, it was not the practice of utilities maintaining such lines to place notices warning of the danger.

The Supreme Court of Kansas, in affirming the verdict for the plaintiff, said that while it may have been unwise for the farmer to build his silo close to the wire, he had the right to use his property up to the boundary line, and his testimony that he would not have built so close if he knew of the danger could not be overlooked. Moreover, the court pointed out that it was not the farmer but his employee who was electrocuted and there was no proof whatever of any knowledge by him of the hazard.

In speaking of the applicable legal principle the court said:

"Where a company has built a power line which extends over private property and is carrying a killing voltage, it is its duty to exercise the highest degree of care that it shall not injure owners of the property or their employees lawfully engaged in the use of the property, and who may not have knowledge of the danger. We think it is not an unreasonable requirement that such a company should place warning signs of danger for the protection of those coming within the danger zone. Such warnings might have saved the life of Davis. Under the facts of the case and the well-recognized rule of the high degree of care required of those transmitting so dangerous a force,

we cannot hold that the placing of warning signs was an unreasonable requirement nor that the failure to place them did not amount to negligence on the part of the defendant." 23 *P.* 2d at 496–497.

Over 25 years later the same court reaffirmed and reapplied the doctrine established in *Worley.* In *Henderson v. Kansas Power & Light Company,* 184 *Kan.* 691, 339 *P.* 2d 702 (1959), over 25 years before the accident the power company had strung its line carrying a deadly current of electricity alongside of a public alley which ran between certain streets. Since 1897 one Voigt had owned a home one side of which abutted the alley, and the roof of which at its highest point was almost 24 feet above the ground. A portion of the power line encroached upon Voigt's property and one wire was 16.1 feet above the highest part of the roof. Voigt had known for many years that the wires overhung his house. However, he did not know of the hazard presented by them, and there were no signs or warnings on the wires or the alley poles.

Voigt's son-in-law, a tenant of the premises, decided to erect a television antenna at the rear of the house. The full height of the antenna was 39 feet eight inches above the ground. Its mast with horizontal arms extending 44 inches was fastened to the pole, which in turn was affixed to the house with a roof clamp. The day after installation of the antenna, its seller and his assistant, who was the plaintiff, Henderson, and the tenant went to the rear of the house to turn it to induce better reception. It was not leaning in either direction and the supporting guy wires were not loose. When the three men took hold of the pole to turn it, there was an "explosion." Henderson, who had "casually" noticed the electric wires, but was unaware of any hazard, was knocked unconscious and the other two men were killed by electrocution. Apparently the current arced from the wire to the antenna.

The Supreme Court reversed the trial court's dismissal of Henderson's personal injury action. In doing so it noted that not only was the current carried in the power

line deadly, but also that the ordinary person had no means of knowing whether any particular wire was carrying a deadly current or was harmless. In addition it placed considerable emphasis upon *Worley v. Kansas Electric Power Co., supra,* 23 *P.* 2d 494. Referring to *Worley* it said:

> "Surely, if it is not unreasonable to require a power company to place warning signs of danger for the protection of those coming within the danger zone in a *rural* area and if such failure presents a question for the jury with respect to defendant's negligence, it follows as a natural conclusion that in a thickly populated *urban* area the construction and maintenance of a power line over private property carrying a deadly current of 33,000 volts without warning signs warning of the danger likewise presents a question of fact for the determination of the jury." 339 *P.* 2d at 708.

The power company there argued as Public Service does here with respect to the decedent's employer's crane, that it was under no duty to foresee or anticipate that a television antenna would be installed in close proximity to its power line and of such a height as to come into contact with its power line. In rejecting the argument the court observed that the test of negligence was not whether the particular act from which the injury resulted should have been anticipated, but whether defendant should have foreseen the probability that injury might result from any reasonable thing that might be done on the owner's property by persons who had a right to go there, either for work, pleasure or business.

*Coatney v. Southwest Tennessee Electric Membership Corp.,* 40 *Tenn. App.* 541, 292 *S. W.* 2d 420 (1956) likewise involved contact between a television antenna and a high tension electric line. There it appeared that the power company ran a 6900 to 7200 voltage line over the driveway of one Cloud, then into and across his lot for a distance of about 122 feet to a pole also located thereon. The wire was uninsulated and no warning signs were erected or other notice given to Cloud or the public of its dangerous nature. The Coatney cousins were engaged in removing a portable antenna which was on a trailer about a foot and a half

high. The antenna pole came into contact with defendant's live wire over the driveway, and both cousins were electrocuted. Although the evidence was uncontradicted that defendant's construction was in accordance with the National Electrical Code and the Rural Electric Authority specifications, the Tennessee Court of Appeals declared that the company should have foreseen that some future legitimate use of the Cloud driveway might bring the user into dangerous contact with the high powered uninsulated line. Under the circumstances, it held that whether the failure to utilize warning signs or other forms of notice of the hazard constituted negligence was for the jury to determine. *Banks v. Central Hudson Gas & Electric Corp.*, 224 *F.* 2d 631 (2 Cir.), *cert. den.* 350 *U. S.* 904, 76 *S. Ct.* 182, 100 *L. Ed.* 793 (1955); *Gladden v. Missouri Public Service Company, supra,* 277 *S. W.* 2d 510; *Chatfield v. New York State Gas & Electric Corp., supra,* 57 *N. Y. S.* 2d 406; *Walpole v. Tennessee Light & Power Co.,* 19 *Tenn.* App. 352, 89 *S. W.* 2d 174 (1935). Cases reaching a contrary result are to be found in Annotation, *supra,* 69 *A. L. R.* 2d 93. We have concluded, however, that the cases outlined in this opinion represent the sounder and more just result.

The cases referred to above with few exceptions deal with the liability of the power company where it has no actual knowledge that cranes, derricks and the like or even television antennas are being used in the vicinity of its uninsulated highly dangerous electric wires. From what has been said with respect to the principle which those cases put forward, it follows that where such actual knowledge appears an even stronger case for notice or warning of the dangers is presented. Not only would a factual issue be present as to whether warning signs are required in such areas where others have the right to be for work, business or pleasure (*Beck v. Monmouth Lumber Co., supra,* 137 *N. J. L.* 268; *Banks v. Central Hudson Gas & Electric Corp., supra,* 224 *F.* 2d 631), but it would also be for the jury to say whether due care required other precautionary measures

on the part of the utility. For example, issues might well arise as to whether the electric lines could or should be de-energized, rerouted or by-passed temporarily, or whether the third person's operation should be supervised by the utility, or whether the wires could have been insulated or placed underground, or finally whether, if warning signs were posted in the area, they were adequate for the purpose.[1] See *Rapp v. Public Service Coordinated Transport, Inc., supra,* 15 *N. J. Super.* at 312; *Beck v. Monmouth Lumber Co., supra,* 137 *N. J. L.* at 271; *Banks v. Central Hudson Gas & Electric Corp., supra,* 224 *F.* 2d at 636; *Walpole v. Tennessee Light & Power Co., supra,* 89 *S. W.* 2d at 177. Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger.

There was conflicting evidence at the second trial of this case on the subject of Public Service's knowledge of the operation of the crane in the vicinity of the highly charged line. For the reasons expressed above, it was not necessary to a finding of negligence against the defendant that the jury reach the conclusion of such knowledge. In view of our holding that mishaps of the type involved here are reasonably foreseeable, the jury should have been told that irrespective of knowledge by defendant as to actual operation of the crane by decedent's employer in proximity to the hazardous wires, it was for them to say whether defendant exercised care commensurate with the risk in failing to post, on the wire-bearing poles or on the wires themselves, warning signs of such adequate intensity as to warn reasonably prudent workmen of the hazard of contact with

[1] We do not mean to indicate that actual knowledge of a particular operation in the vicinity of the wires is a prerequisite to existence of a duty to take precautions other than the posting of warning signs. Even in the absence of such knowledge, the introduction of appropriate testimony may create a jury question as to whether due care requires the taking of some of the additional measures suggested.

the wires. Moreover, if the jury found that defendant did have knowledge of the crane operation, then, since concededly there were no warning signs in the vicinity, it would be open to them to find additionally that the exercise of due care required defendant to give actual notice to the decedent and his fellow-employees of the lethal quality of the overhead line.

In addition to denying negligence, defendant argues that if any negligence on its part could be found, it was not the proximate cause of decedent's death by electrocution. Its position is that the negligence of the crane operator in allowing the boom of the crane to come into contact with the overhead wire was the efficient producing cause. More particularly defendant says that absence of warning signs was merely a condition existing at the time of the accident as distinguished from a moving or producing cause. The argument is that the accident would have occurred even if warning signs had been present. We cannot agree. An appropriate sign might well have caused a reasonably prudent crane operator to exercise greater care to avoid contact between his crane and defendant's wire. Such a sign would bring vividly to his attention that the need to stay clear of the wire was not simply to avoid damaging or breaking the wire or interfering with the transmission of electrical current to defendant's customers. The sign would tell him also that his own life or physical well-being would be endangered if he allowed his crane to touch the wire.

The crane operator testified that it was the practice to keep the boom of the crane more than six feet away from electric wires. He assumed that the wires in the vicinity where he was working were electric wires. However, he had no idea they were "high tension" wires; no one told him so; and there were no signs or warnings on the poles or wires that they were hazardous.

The operator asserted that the top of the crane was more than six feet from the wires before the accident; also that just before lifting the section of pipe his fellow-workers on

the ground, Black and Podolsky, indicated to him that the boom was clear of the wires. How the contact between the boom and the wire came about — if, in fact, there was a contact rather than an arcing of electricity between boom and wire — was not shown. (Defendant offered testimony showing actual contact, but there was some evidence from which a jury could have found otherwise.)

A penal statute in effect at the time of this accident prohibited the operation by an employer or his agent of a crane or like equipment near "high voltage lines" if it was possible to bring the crane within six feet of the line, except where the line had been effectively guarded against danger from accidental contact by (1) erection of mechanical barriers to prevent physical contact, or (2) de-energizing the high voltage conductors and grounding where necessary. *N. J. S. A.* 34:6–47.3. The statute also provided that where a crane was to be operated within six feet of any "high voltage line" the person responsible for the work shall promptly notify the operator of the high voltage line and the operator of the line shall be responsible for the completion of the specified safety measures. *N. J. S. A.* 34:6–47.5. "High voltage" was defined to mean "voltage in excess of seven hundred fifty volts between conductors or from any conductor to ground." *N. J. S. A.* 34:6–47.1. There being no evidence to show that the crane operator or his employer knew the line in question carried a voltage in excess of 750 volts, we fail to see how the statute could have any application to this case. *Nevis v. Pacific Gas & Electric Co., supra,* 266 *P.* 2d at 215–216.

 Moreover, even if it could be said that the employer of the crane operator did violate the statute or that the crane operator was negligent in permitting the boom of his crane to come into contact with defendant's wire, such negligence would not be imputable to Black. Moreover, if the defendant was negligent in failing to post warning signs revealing the hazardous character of the wire, or in failing to take other precautions required by

the danger, it could not be said as a matter of law that the employer's or crane operator's lack of care was the proximate cause of the accident. In such situation the issue of proximate cause is a matter for resolution by the jury. If both Public Service and the crane operator were guilty of concurring negligence, even though in unequal degrees, a verdict adverse to the defendant must be returned if its negligence was a substantial contributing cause of the accident and the jury should be so instructed. In the case of combined or concurrent negligence, only if the jury found that the negligence of the crane operator was the *sole* proximate cause of the accident would a verdict for the defendant be warranted. *Cf. Beck v. Monmouth Lumber Co.,* *supra,* 137 *N. J. L.* at 275–76; *Conowingo Power Co. v.* *State of Maryland, supra,* 120 *F.* 2d at 875; *Grice v.* *Central Electric Power Ass'n.,* 230 *Miss.* 437, 92 *So.* 2d 837, 96 *So.* 2d 909 (1957) ; *Chatfield v. New York State* *Gas & Electric Corp., supra,* 57 *N. Y. S.* 2d 406; *Sandeen* *v. Willow River Power Co.,* 214 *Wis.* 166, 252 *N. W.* 706, 710 (1934).

For the reasons set forth it is our view that the Appellate Division erred in affirming the judgment for the defendant. Accordingly, the judgment is reversed and the matter is remanded for retrial.

*For reversal and remandment* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.