Elbert McGAUGHY and Mary Ann McGaughy, Plaintiffs–Appellees,

v.

CITY OF MEMPHIS and Memphis Light, Gas and Water Division, Defendants–Appellants,

Jerry Neal MELTON and wife Emma Jean Melton, Individually and as Parents and Next Kin of Brian K. Melton, Deceased, Plaintiffs–Appellees,

v.

CITY OF MEMPHIS and Memphis Light, Gas and Water Division, Defendants–Appellants.

Mrs. Esther ELROD, Individually and as Widow of Robert Elrod, Deceased, and Holly R. Elrod, (A Minor) by way of Next Friend and Mother, Esther Elrod, Plaintiffs–Appellees,

v.

CITY OF MEMPHIS and Memphis Light, Gas and Water Division, Defendants–Appellants.

Court of Appeals of Tennessee, Western Section, at Jackson.

July 24, 1991.

Application for Permission to Appeal Denied by Supreme Court Dec. 2, 1991.

Herman Morris, Jr., William M. Jeter, Lucinda S. Murray, Robert A. Cox, Memphis, for MLG & W and City of Memphis Defendants–Appellants.

William A. Cohn, Memphis, for plaintiffs-appellees, McGaughy.

Jerry B. Martin, Memphis, for plaintiffs-appellees, Melton.

James O. Lockard, Memphis, for plaintiffs-appellees, Elrod.

CRAWFORD, Judge.

Defendants, City of Memphis and Memphis Light, Gas & Water Division (hereinafter referred to as MLG & W or Defendants) appeal from the judgments of the trial court awarding money damages to plaintiffs in three cases (consolidated for trial) brought pursuant to the Governmental Tort Liability Act. Wrongful death actions were filed for the deaths of Brian K. Melton and Robert Elrod and a personal injury action was filed by plaintiff Elbert McGaughy.

The complaints as amended allege that plaintiffs' decedents and plaintiff respectively (hereinafter referred to collectively as Plaintiffs), employees of the subcontractor, Madison Steel, were working with a crane in the course of their employment, building a structure on property owned by Weyerhaeuser, Inc., when a beam lifted by the crane came into contact with a high voltage wire over said property. Plaintiffs allege that defendant MLG & W failed to give safety recommendations and guidance to the contractor building the structure and the land owner, that it negligently failed to temporarily relocate, elevate or otherwise shield invitees from the energized lines, that said wires were improperly insulated or not insulated at all and that a dangerous situation was created without notice to the Plaintiffs and their employers. The complaint further avers that MLG & W violat-

ed regulations applicable under the American National Standard Electrical Safety Code adopted under T.C.A. § 68–16–104. Plaintiffs also allege that Tom Lindsey, employee and agent of MLG & W failed to warn all interested parties of the dangers of the power lines, failed to have the lines de-energized or otherwise shielded from contact and failed to take all reasonable precautions to avoid harm from the lines.

MLG & W's answer denies the material allegations of the complaint and joins issue thereon. It denies that it was guilty of any negligence or the breach of any duty and avers that it complied with all safety codes in the installation and maintenance of the electrical lines in question. It avers that the accident was caused by the independent intervening act of the crane operator and by the contributory negligence of Plaintiffs.

We will briefly review the evidence as pertinent to the issues before the Court. The accident occurred at Weyerhaeuser's distribution center, where, among other things, the company maintained lumber storage facilities. It was stipulated that on December 11, 1984, the crane, operated by Plaintiffs' employer, lifted a 39 foot steel beam in the course of constructing a storage shed, and the steel beam came into contact with a power line carrying 13,280 volts of electricity which was maintained by MLG & W, and that this caused the death of Elrod and Melton and the injury to McGaughy. The Weyerhaeuser property is essentially rectangular in shape, with the longer portion of the rectangle extending north and south and a railroad track running along the western border. Also running along the western border, and along the railroad track, are electrical wires carrying high voltage currents which are not the wires involved in the instant case. The power line involved in the instant case, built in 1968, put in service about January, 1969, crosses the Weyerhaeuser property approximately in the middle of the rectangle and connects with the north/south power lines bordering the railroad track. This is a noneasement power line, built over the private property of Weyerhaeuser.

In early 1984, Weyerhaeuser's branch manager, Kenneth Taylor, was considering expansion of a storage shed facility, and a proposed bidder on the project, Throgmorton, arranged for a representative of MLG & W to meet with him and Taylor concerning the location of the proposed addition. At that time, the discussion concerned the proposed storage shed to be built along the western property line and involved the power lines running along the railroad track. The location of this building, as proposed by Taylor, was underneath the north/south power lines, and some discussion was had as to moving the wires and who would be responsible for this expense. Based on the discussions, Mr. Taylor decided it would not be feasible to have the wires moved, but that he should instead move the shed. Apparently, there was no discussion concerning the east/west line which is involved in the instant case.

Subsequently, bid packages were submitted to proposed bidders which included a general site location drawing, showing the approximate location of the building in relation to the north/south power lines and the east/west power line involved in this case. The bid package, among other things, stated: "It is the responsibility of the contractor to contact the local power company to de-energize, to insulate or to move the lines. The contractor is to be fully responsible to alert his employees or subcontractors to the dangers of all surrounding power lines both above and below the ground." The subcontract was subsequently let to C & I Contractors.

A building permit was obtained from the Shelby County Office of Construction Code Enforcement which indicated the proposed building was to be located between two existing power poles at the west side of the building parallel to the power lines. The building was to be 7,200 square feet, measuring 40′ × 80′ and have a height of 24 feet. The permit file indicated that a power line existed on the south end of the building, but the distance from the building is not shown. It should be noted that the power line was not located in an easement.

Kenneth Taylor, the Weyerhaeuser branch manager, testified that he had been with the company for 31 years and that the operation at this location had tripled in volume during that time. He testified that the lumber in the storage facility is stacked to a maximum height of 24 feet and they do stack the lumber under the power lines crossing the property. He recalled the meeting with Tom Lindsey at Weyerhaeuser in May, 1984, and he testified that he received advice from Lindsey regarding the wires that run along the railroad track and stated that at no time was there any discussion concerning the wires that were actually involved in the accident. After talking with Lindsey, Taylor knew that he could not place the building under the north/south power lines and decided to move the building rather than incur the expense of moving the power lines. He explained the invitation for construction bids and the stipulation that it was the contractor's responsibility to take care of the power lines. He testified that the exact location of the building was to be worked out by the contractor in the field and that he did not participate in that. He did tell the contractor that he should not push the limits and if a minimum distance was required they could leave a slightly larger cushion. When Mr. Lindsey left the meeting with Taylor and Throgmorton in May of 1984, Taylor's understanding was that he had learned everything he needed to know about dealing with the power lines in the proposed construction. It was established in his testimony that in day to day operations, lumber is stacked under the wires, but the stacks are at least ten feet below the wires.

Plaintiffs also introduced into evidence the discovery deposition of Clarence Woodell, a supervisor of distribution in the electrical distribution office of MLG & W. He testified that at the time of the accident it was his understanding that Lindsey was a designer. His duties included the design for extensions of service lines to customers and things of a general nature. Lindsey would have the authority to speak on behalf of MLG & W within his area of expertise, and his job would include discussing lines with people on construction sites and giving them basic information concerning building lines and easements. He stated that if a temporary relocation of a high voltage conductor is necessary, appropriate arrangements could be made for this to be done. He further testified that a representative of MLG & W, when visiting a building site, would discuss with the builder the requirements concerning clearance when they are constructing in the vicinity of electrical lines. He stated that a representative should give them warnings of clearances and warnings about the equipment they were using during the construction. He discussed the methods to prevent accidents such as moving the lines, de-energizing the lines, preventing contact with the lines and also giving warnings concerning the high voltage capacity of the lines. He agreed that MLG & W should take an aggressive posture toward safety under the code.

Plaintiffs introduced the testimony of Fred Consterdine, an electrical engineer who qualified as an expert witness. He reviewed the documentation concerning the accident at this construction site and noted that there were no warnings regarding the high voltage power line. The southeast corner of the building measured 2.9 feet away from the wires which would be a violation of the National Electric Safety Code. He further testified that machinery that could stack lumber 24 feet high would exceed the maximum clearance height for a power line that was only 27½ feet high. By the same token, he testified that in order to build a building such as the type, being constructed at this particular location, one would need equipment higher than the building. This equipment could extend as high or higher than the 27.5 feet height of the power lines. He opined that MLG & W did not give adequate warning of the existence of the dangerous lines nor the steps to take to avoid contact with the line. Aside from the building, he testified that the wood stacks measuring approximately 24 feet high under the high voltage power lines present a safety problem in the use of forklifts to stack the lumber.

MLG & W called as its first witness Thomas Lindsey, who testified that he is at the present time a service representative for MLG & W in the custom engineering department. He previously was a layout designer and was in that position at the time he visited the Weyerhaeuser site. He remembered talking with someone during the time in question. He recalled that the discussion involved basically generalities. He remembered telling interested parties that they could not build next to the north/south wires and that he needed to know what the load was going to be when they added new electricity lines. He testified that he gave them his card when he left and told them to get back in touch with him when they determined what they were going to do or had some definite plans. He heard nothing further from them. He gave no other advice except that the building should be moved out and away from the north/south lines.

Tommy Vlahos was presented as a witness on behalf of Defendants. He was chief executive officer of Madison Steel Service which was operating the crane for the construction of the building as a subcontractor of the general contractor. He was not present when the accident happened, although he had been at the job site about an hour before it occurred, but arrived back at the accident site approximately five minutes after the accident. He testified that he discussed with everyone the wires that run along the railroad track. He further testified that he did not understand that the line which was involved in the accident was a high voltage line until after the accident. He stated that if he had been told that they were hot lines and not insulated or if there had been any type of warning signs, the accident would not have happened. They had no advice nor saw any representative from MLG & W.

Norman Timbes, the former Vice President of C & I Contractors testified that he was at the job site everyday, although he was not there at the particular time when the accident happened. He testified that after the plans were drawn and approved by the customer, the plans were submitted to the city and MLG & W for their approval. After they laid out the building, they decided they had to relocate it to be ten feet north from the utility pole. The building was shifted so that the line would not go across the building. He stated that a crane operating further than ten feet away from the lines is permissible, but if they were within the ten feet distance MLG & W should be notified to insulate the lines. In this particular instance, he felt the crane was operating more than ten feet away from the line.

Jim Mangrum testified for the Defendants. He investigated the accident for MLG & W and is now retired. Prior to retirement, he was supervisor of distribution engineering. He testified that the lines in question did not violate the National Electric Safety Code prior to the construction involved. The line was inspected by MLG & W and it was found to be in good condition. He testified that he was Lindsey's supervisor at the time of the accident. He said that MLG & W does not normally approve construction drawings, and that the only time they see them is when the contractor voluntarily brings them to MLG & W. He testified that if he had seen the construction as it progressed and had seen how close it was to the electric lines he would not have allowed the construction to continue. He testified that the line in question was insulated by air and space, which was normally sufficient for high powered lines unless something contacts the lines.

Defendants have presented five issues for review; however, the first three issues deal with T.C.A. § 29–20–205 providing for the removal of immunity for injury caused by the negligent act of an employee and the exceptions thereto. From our review of the trial court's findings, it appears that the trial court did not rely upon T.C.A. § 29–20–205 to find liability on the part of the Defendants. The trial court found that MLG & W had both actual and constructive notice that the high powered line which was involved in the accident was dangerous under the circumstances.

We believe defendants' fourth issue presented for review is dispositive of the appeal insofar as the liability of the Defendants is concerned. The fourth issue, as stated in defendants' brief, is:

IV. Whether the Trial Court erred in failing to consider the statutory provisions of T.C.A. § 29–20–204 relative to dangerous structures, required notice, and/or latent defective conditions?

T.C.A. § 29–20–204 (1980) provides:

**29–20–204. Removal of immunity for injury from dangerous structures—Exception—Notice required.**—(a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity.

(b) Immunity is not removed for latent defective conditions, nor shall this section apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved in addition to the procedural notice required by § 29–20–302.

Defendants argue that there is absolutely no evidence that the electrical lines in question were in a defective condition, nor that the Defendants had some knowledge that they were in a defective condition. We do not disagree with this argument. The argument, however, fails to meet the issue. The statute specifically removes immunity from suit caused by the "dangerous" condition of a structure. In the case at bar, we have a high powered line going across private property which is uninsulated and has no warning signs. The particular private property over which the line crosses is used for lumber storage, and the operation involves equipment to stack and unstack the lumber which reaches to the height within the danger zone for the lines involved. Moreover, the property over which the line crosses is not encumbered with an easement to provide for the line and it is subject to use for various and sundry purposes, including construction of buildings under the lines.

Electricity, if not properly safeguarded, is one of the most dangerous and lethal agencies known to man. *International Harvester Co. v. Sartain*, 32 Tenn.App. 425, 222 S.W.2d 854 (1948). In *Kingsport Utilities v. Brown*, 201 Tenn. 393, 299 S.W.2d 656, 69 A.L.R.2d 87 (1955), suit was filed for injuries resulting from electrical shock when a crane came into contact with a 12,000 volt electrical line. The crane operator's employer was held liable and the utility company was held liable. In affirming the judgment of the lower court, the Supreme Court said:

It does seem, therefore, that it is at least a question of fact about which the minds of reasonable men might differ as to whether a utility is negligent in having such high-powered voltage in lines uninsulated, running through the business section of towns. Of course the law does not require that all lines be insulted at any particular place but only where persons are likely to be and have a right to be, for business, pleasure or otherwise. Judge Felts has covered the question of foreseeability in his opinion in *Spivey v. St. Thomas Hospital*, 31 Tenn.App. 12, 211 S.W.2d 450.

299 S.W.2d at 656. Parenthetically, the Court also noted that although the power line was constructed in accordance with the electrical code, the location of the line was in a growing section, "so that what was safe at the time of the construction, would not necessarily be safe under changed conditions." 299 S.W.2d at 656.

In *Coatney v. Southwest Tenn. Elec. Membership Corp.*, 40 Tenn.App. 541, 292 S.W.2d 420 (1956), the Western Section of the Court of Appeals held that it was a question of fact, for the jury to determine, whether a utility company was guilty of negligence in running uninsulated high power lines over private property with no warning signs or other notice to the owner of the property or the public of the existence of the uninsulated high power lines.

T.C.A. § 29–20–204(b) requires that in order to hold the governmental entity liable there must be "constructive and/or actual notice ... of such condition." In the case

at bar it is uncontroverted that MLG & W built the line in question. It is likewise uncontroverted that the line was inspected in 1983, when it should have been apparent to anyone visiting the property that activities were being conducted in close proximity to the line which could terminate in tragedy. Moreover, Lindsey's visit to the Weyerhaeuser property in May of 1984 should have resulted in his observance of such activity in close proximity to the high powered lines. In addition, he knew that construction was going to be inevitable on the property and certainly this knowledge is notice imputable to his employer, MLG & W. The finder of fact could find it foreseeable that an injury might result from an uninsulated wire coming into contact with the machines used for the lumber stacking or with the machines used in the construction of buildings on the premises.

In *Spivey v. St. Thomas Hospital*, 31 Tenn.App. 12, 211 S.W.2d 450 (1947), it is stated:

> "If there is a substantial likelihood that certain conduct, when pursued by the defendant, will result in some appreciable harm to the plaintiff's person, then the defendant, if he so conducts (sic), cannot escape liability on the ground that he could not foresee the precise manner in which the harm would occur, nor the exact nature of the harm, nor the full extent of such harm. What must be foreseen, in order to establish negligence, is 'harm in the abstract, nor harm in the concrete.' The defendant need not foresee 'that an injury should occur in the exact way or to the same extent as that which did occur.' He need only foresee that some injury of a like general character is not unlikely to result from failure to use care." Jeremiah Smith, Legal Cause in Actions of Tort, Selected Essays on Law of Torts, 690.

> "It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye. *Washington & G.R.Co. v. Hickey*, 166 U.S. 521, 526, 527, 17 S.Ct. 661 [663, 663] 41 L.Ed. 1101, 1103, 1 Am.Neg.Rep.

> 758." Holmes, J., in *Munsey v. Webb*, 231 U.S. 150, 156, 34 S.Ct. 44, 45, 58 L.Ed. 162, 166.

211 S.W.2d at 456.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). From our review of the record, we cannot say that the evidence preponderates against the finding of the trial court that under the circumstances in this case Defendants maintained a dangerous structure and had notice thereof. Accordingly, the judgment for Plaintiffs should be affirmed.

The last issue presented for review as stated in Defendants' brief is:

> V. Whether the Trial Court erred in failing to consider the statutory limitations provided by T.C.A. § 29–20–503 et. seq. in determining the damages to be awarded to plaintiff in this cause?

The trial court reduced the judgments of the Plaintiffs by the amounts received from other tortfeasors. Plaintiffs concede that the trial court was correct in so doing.

The parties agree that the provisions of the Governmental Tort Liability Act (GTLA) in effect at the time of the accident on December 11, 1984 are the controlling provisions to be considered in the instant case. They stipulated that the Defendants are self insured up to $750,000 and have liability insurance coverage from $750,000 to $1,000,000. Defendants contend that under the GTLA in effect at the time of the accident, its liability is limited to the maximum amount set out in T.C.A. § 29–20–403 (Supp.1984) plus any amount of the judgment exceeding the $750,000 up to the $1,000,000. We must respectfully disagree with Defendants' assertions.

T.C.A. § 29–20–403 (Supp.1984) which was in effect at the time of the accident in the instant case provides:

**29–20–403. Liability insurance authorized—Limits—Limits of liability for self-insuring entities.—(a)** Any govern-

mental entity may purchase insurance to cover its liability under this chapter.

(b) Every policy or contract of insurance purchased by a governmental entity as authorized by this chapter shall provide:

(1) Minimum limits of not less than forty thousand dollars ($40,000) for bodily injury or death of any one (1) person in any one (1) accident and not less than eighty thousand dollars ($80,000) for bodily injury or death of any two (2) or more persons in any one accident provided, however, that in cases arising out of the ownership, maintenance, and use of automobiles, the minimum limit shall be not less than one hundred thousand dollars ($100,000) because of bodily injury or death of one (1) person in any one (1) accident, and to a limit of not less than three hundred thousand dollars ($300,-000) because of bodily injury or death of two (2) or more persons in any one accident and to a limit of not less than fifty thousand dollars ($50,000) for injury to or destruction of property of others in any one accident. Provided further, that in the event said governmental entity is unable to purchase insurance to cover its obligations hereunder, except through an assigned risk pool, then for purposes of § 29–20–311 the limits of liability shall be twenty thousand dollars ($20,000) for injury to any one (1) person resulting from one (1) accident and forty thousand dollars ($40,000) for all injuries resulting from one (1) accident with a limit of ten thousand dollars ($10,000) for property damages resulting from any one (1) accident. If insurance is not purchased through an assigned risk pool then the greater limits above apply.

(2) Minimum limits of not less than twenty thousand dollars ($20,000), except as provided above, for injury to or destruction of property of others in any one accident.

(c) Any governmental entity electing to self-insure its liability shall have the same limits of liability as if insurance had been purchased.

T.C.A. § 29–20–311 (1980) provides:

**29–20–311. Judgment over limits of insurance policy prohibited.**—No judgment or award rendered against a governmental entity may exceed the minimum amounts of insurance coverage for death, bodily injury and property damage liability specified in § 29–20–403, unless such governmental entity has secured insurance coverage in excess of said minimum requirements, in which event the judgment or award may not exceed the applicable limits provided in the insurance policy.

T.C.A. § 29–20–403(c) provides for self insurance and specifically provides that the self insurance have the same limits of liability as if insurance had been purchased. This is the same as saying that the government is insured by itself. In this instance, the limit of liability is $750,000 with excess coverage up to $1,000,000. In *Cates v. Electric Power Bd. of Metro Gov't*, 655 S.W.2d 166 (Tenn.App.1983) this Court held that the electric power board, in excluding the first $100,000 of liability, constituted itself a self insured entity under T.C.A. § 29–20–403(c) to the extent of the $100,-000 exclusion. The board was held liable for the entire amount of the judgment which exceeded the minimum limits set out in T.C.A. § 29–20–403. This case is controlling on the point before us. The trial court ruled correctly that the Defendants are liable for the entire amount of the judgment pursuant to the provisions of the Act in force at the time the accident occurred. It should be understood that the opinion on this issue is expressly limited to the applicable law existing at the time of the accident.

The judgments of the trial court are affirmed and the cases are remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellants.

TOMLIN, P.J., (W.S.), and HIGHERS, J., concur.